**HRN, INC., et al.,[1] Appellants,**

**v.**

**SHELL OIL COMPANY, Motiva Enterprises, L.L.C., Equilon Enterprises, L.L.C., and Equiva Services, L.L.C., Appellees.**

No. 14–01–00597–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Feb. 13, 2003.

Rehearing Overruled May 1, 2003.

---

1. A list of the appellants is contained in Appendix A.

George M. Fleming, Mike O'Brien, Robert L. Steinberg, Sylvia Davidow, Houston, for appellants.

Ann Spiegel, Jefferson G. Copeland, Houston, for appellees.

Panel consists of Justices HUDSON, FOWLER, and DUGGAN.*

## OPINION

WANDA McKEE FOWLER, Justice.

Appellants, several hundred lessee dealers operating—or formerly operating—Shell service stations in seventeen states (collectively "the dealers"), brought suit against Shell Oil Company, Motiva Enterprises, L.L.C., Equilon Enterprises, L.L.C., and Equiva Services, L.L.C. (collectively "Shell"), alleging various causes of action arising out of their business relationships with Shell. Among their complaints, the dealers alleged that Shell violated the duty of good faith and fair dealing in setting the price the dealers were contractually required to pay for gasoline. The dealers charged that Shell's actions were intended to drive them out of business so that Shell could replace the dealers with more profitable company-owned or independently operated stations. The parties engaged in extensive briefing and argument on discovery disputes, the merits, and related issues and, over the course of the proceedings, the trial court entered numerous orders in response to the parties' motions. The case was ultimately disposed of by summary judgment. The dealers now appeal from sixteen of the trial court's orders. Because we find that the trial court erred in granting summary judgment on the dealers' pricing claim, we affirm in part, reverse in part, and remand in part.

---

* The Honorable Lee Duggan, Jr., Retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

## I. PROCEDURAL BACKGROUND

The dealers originally brought suit alleging various state common law and statutory claims, including breach of contract, antitrust violations, negligence, fraud, and tortious interference with contract. The live pleading, the tenth amended petition, narrowed the claims to breach of contract and tort claims. In two orders, the trial court rendered summary judgment on all claims—the first on June 13, 2000, and the second on December 14, 2000. The June 13 order also granted summary judgment dismissing certain dealers' claims based on releases they signed. At various times during the pendency of the case, other dealers were dismissed for failing to respond fully to discovery; some were later reinstated.

Before final summary judgment was granted, the dealers moved to compel discovery from Shell on several occasions. They also moved several times for continuances based on their asserted need for additional discovery. The trial court denied most of the requests for discovery, and denied all motions for continuances except one. Following the entry of the final summary judgment disposing of the dealers' remaining claims, the dealers appealed.

## II. FACTUAL BACKGROUND

Shell is a major refiner and marketer of gasoline that distributes and markets its gasoline through both a retail and a wholesale network of distributors. Shell's retail network includes lessee dealers such as appellants, who lease their gasoline stations from Shell and purchase gasoline from Shell for resale to the public. Shell also distributes gasoline directly to the public through company-operated stations

and contractor-operated stations that do not have separate supply contracts with Shell for gasoline. In major metropolitan areas, Shell may use a combination of these enterprises to market Shell-branded gasoline to retail customers.

In metropolitan fringe areas and rural areas, Shell distributes gasoline primarily through its wholesale distributors, commonly known as "jobbers." Jobbers develop and often own their own service stations, and operate fleets of trucks to pick up gasoline at refiners' terminals. Jobbers may have distribution agreements with several refiners simultaneously. They pay a JTP ("jobber terminal price") on the gasoline they pick up from Shell's terminals. The JTP is traditionally termed the "rack price."

### A. The Dealers' Contractual Relationship with Shell

Shell's relationship with its lessee dealers is governed by two agreements: (1) a lease, under which Shell leases the station to the dealer for a monthly rental fee; and (2) a dealer agreement, under which each lessee dealer agrees to buy gasoline at the "dealer prices for the respective grades and brands delivered in effect at the time loading commences at the Plant and for the place of delivery." Shell's dealer price is referred to as the DTW ("dealer tank wagon") price because it includes delivery to the dealer's station by Shell tanker truck.

### B. The DTW

Shell determines the DTW prices the dealers pay, and prohibits the dealers from selling any gasoline except Shell-branded gasoline. According to the dealers, they are also prohibited from purchasing their gasoline from jobbers because of a strong

disincentive in the jobbers' contracts with Shell, effectively rendering them "captive buyers" of gasoline directly from Shell.[2] Further, the dealers contend that the DTW was unreasonably high. According to the dealers' experts, 73–80% of the gasoline sold in the Houston area was sold through stations that were able to purchase gasoline at prices lower than the DTW prices Shell charged its lessee dealers during the period of 1995–1999. That was because, the experts explained, the majority of Houston gas retailers' acquisition costs were based on rack prices, which were lower than Shell's DTW prices to dealers. Several dealers complained that the retail gas prices offered to the public by competing company-owned and jobber Shell stations were lower than the DTW prices Shell charged them. As a result of the unreasonably high DTW prices, the dealers contend, they were unable to price their gas competitively and were being forced out of business. The dealers alleged that Shell intentionally sought to drive the dealers out of business so that it could concentrate on more profitable distribution channels.

### C. The VRP

In May of 1982, Shell instituted a voluntary program known as the "Variable Rent Program" or VRP. Under the VRP, if a lessee dealer sold an amount of gas over a specified minimum, the DTW would be discounted by several cents per gallon and the discount would appear as a reduction in the next month's rent under the lease. Shell offered the VRP to its dealers as an opportunity to reduce their rent costs based upon gasoline volume increases at their stations. However, the appellants charge that any savings was illusory be-

---

**2.** The jobber contract provides that if a jobber sells Shell-branded gasoline to a station that is in competition with a station served direct- ly by Shell, then the jobber will be charged DTW for such gasoline rather than JTP.

cause Shell included a rent component in the DTW pricing designed to offset any rent reductions. Appellants further charge that Shell and its territory representatives fraudulently concealed from the dealers the connection between their rent and their DTW prices. The VRP program was cancelled as of April 1, 1998.

## III. ISSUES ON APPEAL

On appeal, the dealers raise five issues. The first issue is a general assignment of error based on the trial court's grant of summary judgment. The second issue challenges the trial court's grant of summary judgment on the ground that Shell set its DTW in good faith and thus did not breach the open price term of the dealer agreements. In the third issue, the dealers contend the trial court erred in granting summary judgment against certain dealers on the grounds that they signed valid releases. In issue four, the dealers contend the trial court abused its discretion in denying the discovery and continuances the dealers requested. The fifth issue challenges the trial court's dismissal of certain dealers for failure to respond to discovery. In response, Shell contends that certain dealers or their stations were omitted from the last live pleading, resulting in the waiver of their claims.

### A. ALLEGED ERROR IN GRANTING SUMMARY JUDGMENT

We begin with two issues: the dealers' claim that the trial court wrongly entered summary judgment on their pricing claim and Shell's affirmative defense of release.

In their first three issues, the dealers challenge only the dismissal of their claims based on the open price term and the releases. Shell filed both a traditional and a no-evidence motion for partial summary judgment on the dealers' claim that Shell did not set its DTW in good faith. On its own affirmative defenses, including the af-firmative defense of release, Shell filed only a traditional summary judgment motion.

### 1. Standard of Review

In a traditional motion for summary judgment, the movant has the burden of showing, with competent proof, that no genuine issue of material fact exists, and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985); TEX.R. CIV. P. 166a(c). When a defendant is the movant for summary judgment, it has the burden to conclusively negate at least one essential element of the plaintiff's cause of action, or conclusively establish each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). If the movant's motion and summary judgment proof facially establish its right to judgment as a matter of law, the burden shifts to the non-movant to raise a material fact issue sufficient to defeat summary judgment. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). In deciding whether a disputed material fact issue exists precluding summary judgment, we resolve every reasonable inference in favor of the non-movant and take all evidence favorable to it as true. *Science Spectrum,* 941 S.W.2d at 911; *Nixon,* 690 S.W.2d at 548–49.

The rules for a no-evidence motion for summary judgment also are well-known. The movant must show that (1) there is a complete absence of proof of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Blan v. Ali,* 7 S.W.3d 741, 747 (Tex.App.-Houston [14th

Dist.] 1999, no pet.). In considering a "no evidence" summary judgment, we review the proof in the light most favorable to the non-movant and disregard all contrary proof and inferences. *Id.* If the non-movants' proof rises to a level that would enable reasonable and fair minded people to differ in their conclusions, then they have presented more than a scintilla. *Id.*

## 2. Good Faith and the Open Price Term

In their tenth amended petition, the dealers alleged that the pricing provision in the dealer agreements was an "open price term" that obligated Shell to set the DTW price for gasoline in good faith, and that Shell breached this contractual obligation. This claim is based on the good faith provisions of the Uniform Commercial Code, which have been incorporated into the Texas Business and Commerce Code. *See* TEX. BUS. & COM.CODE ANN. §§ 1.101–11.108 (Vernon 1994). In particular, section 2.305 of the Code,[3] which governs open price terms, imposes the requirement that "[a] price to be fixed by the seller or by the buyer means a price for him to fix in good faith." *See* TEX. BUS. & COM.CODE ANN. § 2.305(b).

Here, it is undisputed that the DTW pricing provision is an "open price term"

governed by section 2.305(b) of the Code. Instead, the dispute centers on what constitutes a breach of the duty of good faith. The dealers contend that determining whether an open price term was set in good faith is a fact-intensive inquiry not appropriate for summary judgment. *See Allapattah Servs., Inc. v. Exxon Corp.,* 61 F.Supp.2d 1308, 1324 (S.D.Fl.1999) (holding that the parties' intentions in setting an open price term and the reasonableness of an open price term are questions for the trier of fact). They also contend that they have raised fact issues on the following, all of which relate to good faith: (1) the dealers were "captive buyers"; (2) the DTW was unreasonably high and uncompetitive; (3) any savings obtained through the VRP was added to the DTW; (4) Shell intended to eliminate dealers from its distribution system; and (5) the dealers have experienced decreasing gas sales and declining business, and some have been forced out of business. Shell responds that it conclusively demonstrated good faith because it was undisputed that its DTW prices were within the range of DTW prices charged by other major oil companies in the relevant markets.

### a. *The Definition of Good Faith*

The duty of good faith is defined several places in the Code. "Good faith" is defined

---

**3.** The full text of section 2.305 is as follows:

(a) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if
(1) nothing is said as to price; or
(2) the price is left to be agreed by the parties and they fail to agree; or
(3) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.
(b) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

(c) When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as cancelled or himself fix a reasonable price.
(d) Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract. In such a case the buyer must return any goods already received or if unable so to do must pay their reasonable value at the time of delivery and the seller must return any portion of the price paid on account.
TEX. BUS. & COM.CODE ANN. § 2.305.

generally as "honesty in fact in the conduct or transaction concerned." *Id.* § 1.201(19). In the case of a merchant, the Code provides that good faith "means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." TEX. BUS. & COM.CODE ANN. § 2.103(a)(2). Shell does not dispute that it is a merchant as that term is used in the Code.[4]

■ Additionally, Official Comment 3 to section 2.305 provides the following guidance:

> Subsection (2), dealing with the situation where the price is to be fixed by one party rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2–103). But in the normal case a "posted price" or a future seller's or buyer's "given price," "price in effect," "market price," or the like satisfies the good faith requirement.

TEX. BUS. & COM.CODE ANN. § 2.305 cmt. 3.[5]

### b. *The Normal Case: Good Faith Presumptively Satisfied*

The gravamen of the parties' dispute is whether this case constitutes a "normal case" in which the good faith requirement is presumptively satisfied, as Shell urges, or whether, as the dealers allege, numerous issues of fact render this case abnormal and preclude summary judgment in favor of Shell.

While no Texas state court has addressed this issue in a similar context, Shell directs us to courts in other states that have construed comment 3 as creating a presumption that a "price in effect" or "posted price" was set in good faith. *See, e.g., Richard Short Oil Co., Inc. v. Texaco, Inc.,* 799 F.2d 415, 422 (8th Cir.1986) (holding that Texaco's "posted price" to distributors satisfied the good faith requirement of Section 2–305(2) without more); *Wayman v. Amoco Oil Co.,* 923 F.Supp. 1322, 1350 (D.Kan.1996), *aff'd mem.,* 145 F.3d 1347 (10th Cir.1998) (holding that Amoco's "price in effect" to lessee dealers satisfied Section 2–305(2)'s good faith requirement). The *Wayman* court stated that comment 3 "reflects a belief that § 2.305(2) should not require suppliers in industries where 'price in effect'-type contracts are often used to establish that the price ultimately charged was a reasonable one." *Wayman,* 923 F.Supp. at 1346.

Relying on *Wayman,* Shell argues that the comment demonstrates that section 2.305 was intended to address only claims of discriminatory pricing among buyers with identical pricing provisions. *See id.* at 1346–47. Only discriminatory pricing would take a price out of the "normal case" in which the pricing was presumed to be set in good faith. Shell contends its DTW

---

4. The Texas UCC defines "merchant" as

> a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by has employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

TEX. BUS. & COM.CODE ANN. § 2.104(a) (Vernon 2002).

5. While the comments following the code provisions are not law, they are persuasive authority concerning interpretation of the statutory language. *See Lockhart Sav. & Loan Ass'n v. RepublicBank Austin,* 720 S.W.2d 193, 195 (Tex.App.Austin 1986, writ ref'd n.r.e.).

price is a "posted price." And since the dealers are not alleging discriminatory pricing, Shell claims it was entitled to summary judgment on the pricing claim. Moreover, Shell asserts, it conclusively demonstrated that its prices were "commercially reasonable" because they were within the range of DTW prices charged by other major oil companies in the relevant markets. Phrased another way, Shell's claim essentially is that a posted price within the range of DTW prices of other major oil companies cannot be considered an abnormal case.

### c. *Mathis: Subjective Good Faith and the "Abnormal Case"*

However, the Fifth Circuit has disagreed with *Wayman* and the reasoning that Shell proposes. In the recent case of *Mathis v. Exxon Corp.*, 302 F.3d 448 (5th Cir.2002), which involved nearly identical facts and issues to this case, the Fifth Circuit reviewed a jury verdict that Exxon breached its agreement with its franchisees because it set its DTW in bad faith. Like Shell, Exxon contended that the breach of contract claim under section 2.305 of the Code was precluded as a matter of law because it charged its franchisees a DTW price comparable to that charged by its competitors.

■ To determine what constitutes a breach of the duty of good faith under section 2.305 of the Code and to determine if comment 3 contemplates both an objective and subjective component of good faith, the *Mathis* court undertook a detailed analysis of the term "good faith" as used in various sections of the Code.[6] *Id.* at

453–56. It determined that the Code employs two standards of good faith—one objective, which incorporates the thought that a merchant must observe reasonable commercial standards of fair dealing—and one subjective—which incorporates a requirement that the merchant act with an honest intent or with "honesty in fact." The court also concluded that comment 3 incorporated both of those standards.[7] *Id.* at 454 n. 4. Having made these conclusions, the ultimate question for the court regarding comment 3 became what constituted an abnormal case, and specifically, whether discriminatory pricing was the only abnormal case. *Id.* at 455–456.

■ The court concluded that, although price discrimination was specifically listed in the comment as being abnormal, it was listed, not as being exhaustive of what constitutes an aberrant open price case, but merely as a "subset of what constitutes an aberrant case." *Id.* at 457.

> Any lack of subjective honesty-in-fact good faith is abnormal; price discrimination is only the most obvious way a price-setter acts in bad faith—by treating similarly-situated buyers differently.

> \* \* \* \* \* \*

> Courts that have addressed the normalcy question have consistently held that a lack of subjective good faith takes a challenge outside the bounds of what is normal. *Id.*

> Like the plaintiffs [in these other cases], the franchisees here are alleging a breach of good faith grounded not in Exxon's failure to price in accord with an established schedule, but in its failure to set the price in good faith. Suits

---

6. The court focused primarily on sections 1.201(19) and 2.103. *Id.* at 453–56.

7. The court concluded this, in part, because, in defining what "good faith" means, the comment states that it "includes" observance of reasonable commercial standards of air dealing. By using the word "includes" the framers were implying that objective good faith was not the only component of good faith.

recognizing such a cause of action are rare, and with good reason: We would be ill-advised to consider a case to be outside the norm based only on an allegation of improper motive by the party setting the price.

Plaintiffs produced enough evidence to escape comment 3's "normal case" limitation. They showed, for example, that Exxon planned to replace a member of its franchises with CORS [company owned stations], that the DTW price was higher than the sum of the rack price and transportation, that Exxon prevented the franchisees from purchasing gas from jobbers after 1994, and that a number of franchisees were unprofitable or non-competitive.

*Id.* at 457–458 (footnotes and citations omitted).

■ We agree with the *Mathis* court's conclusions, and agree that its conclusions are consistent with those of other courts that the good faith requirement of section 2.305 involves fact findings that are not appropriate for summary judgment. *See, e.g., Nanakuli Paving and Rock Co. v. Shell Oil Co.,* 664 F.2d 772, 805–06 (9th Cir.1981); *Allapattah,* 61 F.Supp.2d at 1325; *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 773 A.2d 1121, 1130–31 (2001); *E.S. Bills, Inc. v. Tzucanow,* 38 Cal.3d 824, 215 Cal.Rptr. 278, 700 P.2d 1280, 1286 (1985).

■ Therefore, we reject Shell's contention that section 2.305 applies only to discriminatory pricing claims, and hold that the good faith requirement of section 2.305(b) of the Code imposes on merchants both subjective good faith—honesty-in-fact—and objective good faith—observance of reasonable commercial standards of fair

dealing in the trade. Additionally, a merchant satisfies the good faith requirement in the "normal case" of a fixed price so long as the merchant exercises honesty-in-fact in setting the price.

■ As the *Mathis* court stated, however, a case must involve more than mere allegations of improper motive to take a claim outside the normal case. *Mathis,* 302 F.3d at 457; *see also Wilson,* 773 A.2d at 1130 (stating that "an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive"). As noted, the *Mathis* franchisees presented evidence that Exxon planned to replace a number of its franchises with company-owned stations, that the DTW price was higher than the sum of the rack price and transportation, that Exxon prevented the franchisees from purchasing gas from jobbers, and that a number of franchisees were unprofitable or non-competitive. *See Mathis,* 302 F.3d at 457–58. This evidence was sufficient to take the case out of comment 3's "normal case" limitation. *Id.* at 457.

Here, the dealers have produced similar evidence in support of their claims.[8] Among other things, the dealers presented evidence that (1) 73–80% of their Houston competition paid rack price—or lower—for gas while they paid Shell's significantly higher DTW price, (2) the dealers were "captive buyers" required to purchase Shell-branded gas at Shell's price, and (3) Shell's DTW price was often higher than competitor's prices. The dealers presented evidence that their gas sales have been decreasing and their businesses have been declining over the past several years, that they have lost money, and that some have gone out of business. The dealers also

---

**8.** Indeed, the dealers employ the same expert used by the *Mathis* franchisees, Barry Pulliam, to support their allegations that Shell's DTW price exceed the rack price plus costs and that its pricing was uncompetitive. *See Mathis,* 302 F.3d at 460–61.

pointed to evidence that, unbeknownst to them, Shell intended to reduce the number of dealer stations while increasing the number of company- or contractor-owned stations. This evidence, they contend, supports an assertion that Shell intended to eliminate the dealers in order to replace them with more profitable operations.[9]

Viewing the evidence in the light most favorable to the dealers, we agree that they have presented sufficient evidence to raise a fact issue regarding whether Shell set its DTW prices in good faith. Therefore, the trial court erred in granting summary judgment on the dealers' pricing claim. Our resolution of this issue renders it unnecessary to address the dealers' contention in their fourth issue that they were denied continuances to obtain additional discovery. We are confident that any discovery disputes arising after remand will be addressed by the trial court in a manner consistent with our holding.

### 3. The Releases

In their third issue, the dealers contend the trial court erred in granting Shell summary judgment against a number of dealers that had executed releases in favor of Shell when they sold their stations to Shell or others.[10] Twenty-seven of the dealers

appealed, arguing the releases are unenforceable on the grounds of economic duress. In the dealers' affidavits in support of their economic duress claim, they stated that they were forced to sell their stations because they became financially unviable. They also stated that they bought gas from Shell at prices higher than their competitors' retail prices, and that consequently, their gas sales volume decreased, leading to lower profits and financial problems. Because the dealers could not afford to abandon their businesses, they contend, they were forced to sell them to Shell or to other dealers and to sign the releases because of economic duress.

▮▮▮▮ Duress is an affirmative defense in confession and avoidance of the affirmative defense of release. *Brown v. Cain Chem., Inc.*, 837 S.W.2d 239, 242–43 (Tex.App.-Houston [1st Dist.] 1992, writ denied). Once Shell conclusively established the elements of its affirmative defense of release, the burden shifted to the dealers to raise a genuine issue of material fact on duress. *Id.* at 243; *Spring Branch Bank v. Mengden*, 628 S.W.2d 130, 135 (Tex.App.-Houston [14th Dist.] 1981, writ ref'd n.r.e.). There can be no duress without the following: (1) a threat or action

---

9. The evidence is not addressed in greater detail because much of it was filed under seal.

10. Depending on the circumstances, the dealers executed documents containing either of the following provisions:

> 2. *Release*
> Shell and Dealer hereby respectively release each other from all claims and demands which each now has against the other (whether or not now known to either) arising directly or indirectly out of or in connection with each terminated agreement and relationship specified above, or any consignments, sales or deliveries of motor fuels and other products by Shell to Dealer, excepting, however, claims of Shell against Dealer for indebtedness, reimbursement or

indemnification, or relating to personal property of Shell heretofore or now in Dealer's possession.

10. Shell and Assignor hereby release and forever discharge each other from any and all claims, obligations and demands which each now has against the other (whether or not now known by either) arising directly or indirectly out of or in connection with the Dealer documents and the franchise or other relationships arising there under or any sales or deliveries of any products by Shell to Assignor there under or otherwise, excepting, however, claims of Shell against Assignor for indebtedness, reimbursement or indemnification, or relating to equipment.

taken without legal justification; (2) the action or threat was of such a character as to destroy the other party's free agency; (3) the threat or action overcame the opposing party's free will and caused it to do that which it would not otherwise have done and that which it was not legally bound to do; (4) the restraint was imminent; and (5) the opposing party had no present means of protection. *Chapman Children's Trust v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 443 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). Furthermore, economic duress may be claimed only when the party against whom it is claimed was responsible for the claimant's financial distress. *Deer Creek Ltd. v. N. Am. Mortgage Co.*, 792 S.W.2d 198, 203 (Tex.App.-Dallas 1990, no writ).

■ Here, the dealers' affidavits, all generally the same, state that Shell's actions left the dealers to either face bankruptcy or to sell or close their businesses, and that Shell "demanded" that they sign a release before it would approve any sale. Additionally, the dealers stated that they were "forced" into signing the releases because they "could not afford to lose everything," and felt they were "coerced to do so or face financial ruin."

We find these affidavits to be conclusory and ineffective to prevent the entry of a summary judgment. *See Burrow v. Arce*, 997 S.W.2d 229, 235–36 (Tex.1999); *In re Am. Home Prods. Corp.*, 985 S.W.2d 68, 74 (Tex.1998). Even assuming Shell set the DTW prices with the intention of driving the dealers out of business, the dealers' statements do not satisfy all the elements of economic duress. The dealers identify no facts in either their affidavits or the record to show that financial ruin was imminent or that they had no present means of protection. *See Deer Creek*, 792 S.W.2d at 203 (holding release not invalid in absence of evidence supporting elements of economic duress). The affidavits fail to give the court sufficient facts to make an independent evaluation of whether their situation met the five elements of economic duress. In addition, we note that the dealers direct us to no cases in which a claim of economic duress has succeeded at all, much less one that succeeded in a similar circumstance.

Therefore, we overrule the dealers' third issue and uphold the trial court's grant of summary judgment in favor of Shell against the dealers who executed releases for particular stations, and whose claims related to those stations, on the ground of release.

### 4. The Dismissal of Eight Dealers for Failure to Respond to Discovery

In their fifth issue, the dealers contend that the trial court abused its discretion in dismissing eight dealers' claims with prejudice for failing to fully and timely respond to discovery. The dealers argue that dismissal with prejudice was an excessive and improper sanction, especially before the end of the discovery period. The dealers also contend that the trial court applied a double standard because it required full compliance with Shell's discovery requests while not requiring full compliance with the dealers' discovery requests.

### a. *The Applicable Dates and Deadlines*

Shell served its first request for production of documents on December 15, 1999, and a revised first set of written interrogatories on May 19, 2000. On June 16, 2000, the trial court signed an agreed order on a rolling discovery plan, requiring the dealers to respond to the first three subsections of Shell's interrogatory number 1 by June 19, and to answer the remaining interrogatories and to produce responsive documents not already produced at a rate

of 75 dealers per week beginning on June 26. Responses to the interrogatories for all dealers were to be completed and all responsive documents were to be produced no later than August 21, 2000. When some dealers failed to produce documents in response to the rolling discovery plan, Shell filed a motion to compel. On July 24, 2000, the trial court ordered the dealers to respond fully to Shell's requests for production, and additionally ordered certain plaintiffs to produce certain categories of documents by August 1, 2000.

On August 22, one day after the court-ordered deadline for the dealers to complete their discovery responses, Shell filed a motion to dismiss the claims of those dealers that had completely failed to respond to Shell's requests for production and interrogatories, and to compel interrogatory responses and depositions from other dealers. In response, the dealers requested that those who had partially responded to either Shell's first request for production or its revised first set of interrogatories be given additional time to respond before dismissal. They also requested that those who wholly failed to comply with Shell's discovery requests be permitted to nonsuit their claims without prejudice. At a hearing on August 28, the trial court ordered the dealers to provide all requested documents and interrogatory

answers by September 7, and further indicated that he would dismiss those who did not comply by that date.

On September 11, the trial court ordered approximately 200 dealers dismissed with prejudice for failing to respond to discovery. Thereafter, thirty-three dealers filed eight separate motions to reinstate. The trial court reinstated all but eight dealers. These dealers moved for reinstatement on the basis that they had since answered the discovery.[11] However, the record contains no evidence of the discovery that was presumably produced, or any indication that any subsequent production would have satisfied the trial court's earlier orders. And, in any event, the dealers offer no explanation for their failure to comply with the trial court's orders prior to dismissal. The dealers do not contend that any dealers were dismissed in error because they fully complied with the trial court's orders prior to dismissal.[12]

#### b. *The Law Governing Death Penalty Sanctions*

 Texas Rule of Civil Procedure 215.2(b) provides that "[i]f a party fails to comply with proper discovery requests or to obey an order to provide or permit discovery the court in which the action is

11. Although the dealers include Robert Rossini, Sr. as one of the eight dealers seeking reinstatement on the grounds that the discovery was later produced, his name does not appear on the motion to reinstate filed September 14, 2000 by the other seven. Instead, he appears to have sought reinstatement in a separate motion, dated September 29, 2000, in response to the dismissal of his claims based on Shell's affirmative defense of release.

12. The dealers' motion to reinstate contends generally that, since September 11, 2000, several of the dealers "have responded to [Shell's] Request for Production available after September 14, 2000." However, with re-

gard to plaintiff Vasudev Patel, one of the eight dealers seeking reinstatement, the motion states that he had previously served responses to Shell's requests for production on August 4, 2000. The motion also states vaguely that he also had "previously served interrogatory responses." However, even assuming Patel produced all documents responsive to Shell's discovery requests on August 4, he missed the deadline for compliance with the trial court's order to produce all documents by August 1, and there is no indication that Patel fully or timely produced responses to Shell's interrogatories by the trial court's September 7, 2000 deadline.

pending may, after notice and hearing, make such orders in regard to the failure as are just," including "an order dismissing with or without prejudice the action or proceedings or any part thereof." Tex.R. Civ. P. 215.2(b)(5). In *TransAmerican Natural Gas Corp. v. Powell*, the Texas Supreme Court set out the standards for determining whether an imposition of sanctions is just for purposes of Rule 215.2. 811 S.W.2d 913, 917–18 (Tex.1991). First, a direct relationship must exist between the offensive conduct and the sanction imposed, meaning that the sanction must be directed against the abuse and toward remedying the prejudice to the injured party. *Id.* at 917. This also means that the sanction should be visited upon the offender, meaning that the trial court must attempt to determine whether the offensive conduct is attributable to counsel, the party, or both. *Id.* Second, the sanctions must not be excessive. *Id.* In this regard, "courts must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance." *Id.*

Although imposing a death penalty sanction creates a concern because a court thereby renders judgment with complete disregard for the merits of the case, *Hamill v. Level*, 917 S.W.2d 15, 16 (Tex.1996), if a party refuses to produce material evidence—in spite of lesser sanctions—the court may presume that an asserted claim or defense lacks merit and dispose of it. *TransAmerican*, 811 S.W.2d at 918. We review the trial court's dismissal order for abuse of discretion. *Id.* at 917.

#### c. *Death Penalty Sanctions Were Appropriate*

Here, the trial court's second discovery order included a lesser sanction in the form of a warning that non-compliance

would result in dismissal. *See Andras v. Mem'l Hosp. Sys.*, 888 S.W.2d 567, 572 (Tex.App.-Houston [1st Dist.] 1994, writ denied). The dealers failed to timely produce responsive documents or answers to interrogatories despite the trial court's two earlier orders to produce. The dealers also never gave an explanation for their failure to produce the discovery. The discovery Shell sought was material to the dealers' allegations and alleged damages, and the failure to provide it would have impacted Shell's ability to prepare for trial on those dealers' claims. Given these facts, the trial court could have determined that the dealers' claims lacked merit. *See TransAmerican*, 811 S.W.2d at 918; *see also In re Zenergy, Inc.*, 968 S.W.2d 1, 11 (Tex.App.-Corpus Christi 1997, no pet.) ("Without such documentation [of plaintiffs' damages], the trial court was left with no other conclusion than that the case lacked merit."). We cannot say that, on this record, the trial court abused its discretion in dismissing the claims of those dealers with prejudice.

Therefore, we overrule the dealers' fifth issue, and sustain the trial court's dismissal of the eight dealers for failure to comply with discovery orders.

#### 5. The Omission of Certain Dealers from the Last Live Pleading

In response to the dealers' issues, Shell argues that certain of the dealers and their stations were omitted from the tenth amended petition, the last live pleading; therefore, their claims were effectively dismissed from the suit. *See* Tex.R. Civ. P. 65; *Mercure Co. v. Rowland*, 715 S.W.2d 677, 679 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.). Moreover, Shell contends that the deletion of those dealers and stations after the trial court's ruling on the first motion for summary judgment waives any complaint on appeal. *See Ran-*

*dolph v. Jackson Walker L.L.P.*, 29 S.W.3d 271, 275 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *Radelow–Gittens Real Prop. Mgmt. v. Pamex Foods*, 735 S.W.2d 558, 560 (Tex.App.-Dallas 1987, writ ref'd n.r.e.).

The dealers respond that Shell is mistaken regarding five of the dealers and stations because they were in fact named in the tenth amended petition, and five others were reinstated after the tenth amended petition was filed. As to the rest, the dealers contend all of them were dismissed on the grounds that they signed releases or failed to timely produce discovery, and the general pleading rules should not apply because their omission was inadvertent. *See American Petrofina, Inc. v. Allen*, 887 S.W.2d 829, 830–31 (Tex.1994).

We hold that all dealers and stations actually named in the tenth amended petition, and those that were reinstated after the tenth amended petition was filed, are parties to this appeal. As to the remaining dealers and stations, however, we have sustained the trial court's rulings on Shell's affirmative defense of release and its refusal to reinstate certain dealers and stations whose claims were dismissed for failing to timely respond to discovery. Therefore, we need not determine whether the omission of those dealers and stations was inadvertent, because they were properly dismissed on other grounds.

## IV. CONCLUSION

In summary, we reverse the trial court's judgment dismissing the dealers' claim that Shell breached the good faith requirement of section 2.305 of the Code in setting the DTW price and remand for further proceedings in accordance with this opinion. Because of our resolution of this issue, we do not reach the dealers' complaint that they were denied continuances to obtain additional discovery before the summary judgment hearings. We affirm that portion of the trial court's judgment dismissing the claims of those dealers and stations on the grounds of release and failure to respond to discovery orders.

## APPENDIX A

HRN, Inc., Abuzaid, Maged (Abuzaid, Inc.); Adams, Thomas (Goff Enterprises, Inc.); Adams, Ken (Fireball, Inc.); Afshari, Iradj (Caspian Petroleum Co.); Akshar, Ghanem (Houda, Inc., Boushra, Inc., Askam, Inc.); Al–Hakim, Munadhil (Al–Hakim Corp., Farmington Express, Inc.); Alshawwa, Samih (Samih Alshawwa); Ambroziak, Mark (Five–M Enterprises, Inc.); Ancker, Larry (Red Eagle, Inc., Ancker Eagle, Inc., Colonial Eagle, Inc.); Anderson, John (John Anderson); Argyriou, Nick (N.S.A. Enterprises, Inc.); Ashodian, Richard (Ricmar, Inc.); Askar, Bassam (Starco Management Co., Inc.); Audette, Robert (Bob Audette, Inc.); Badreshia, Parshotam (Parshotam Badreshia); Baghdadi, Syed (Syed L. Baghdadi); Bahouth, Samir (Bahouth, Inc.); Balhan, Maurice (Balhan Enterprises, Inc.); Balloutine, Fouad (Balloutine & Sons, Inc.); Bautista, Rudy (R & L, Inc.); Behrang, Mohammed (Behrang, Mohammed M.); Benaksas, Daniel (The Pro Odos Corp.); Berkey, Jr., Calvin (Calvin Berkey Enterprises, Inc.); Berkey, Sr., Calvin (C & B Car Wash, Inc.); Berry, Abdel (Berry Shell, Inc.); Beyer, Edward (Beyer, Inc.); Beyer, Mark (MB Enterprises, Inc., Beyer Enterprises, Inc.); Bitetzakis, John (Woodhaven Shell, Inc., Tarpon Mart, Inc., Bay, Inc., Northern Gasoline Corporation); Bond, Roy (Roy L. Bond, Inc); Boschert, Daniel (Spebo Oil Co., Inc., Daniel S. Boschert, Inc.); Bouzeid, Abdul (Abdul Bouzeid); Braley, Douglas (KRS, Inc., State Street Food Mart, Inc.); Brammer, Marge (M. Brammer, Inc.); Bruce, Horace (Bruco, Inc.); Brus, Jr.,

Michael (Mike's Shell Service of Sayreville); Bucalo, Jeffrey (New Five Shell, Inc.); Buchanan, Buck (Alatex, Inc.); Burton, Rae (Rae Burton); Butzlaff, Robert (Plaza Shell, Inc.); Carlson, Duane (Carlson Oil, Inc.); Cavanaugh, Mitchell (Tri–C Enterprises, Cavanaugh, Inc., Arlington & Gold, Inc.); Ceriello, Victor (NOS Corp., COS Corp., CVI Corp.); Ceylan, Thomas (Thomas Ceylan); Chamchyan, Nektar (A.A.P. Corp.); Chang, Kyung (Kyung Chang); Charania, Nasiruddin (Ekram & Nasir Corporation); Chawla, Mary (Mille Fleurs, Inc.); Clausen, David (Dave's Fanwood Shell, Inc.); Coppedge, Everett (Everett Coppedge); Corso, Lloyd (Either–Orr, Inc.); Cumming, Mark (Moday, Inc.); Cutsinger, Richard (Petro Station Holdings, Ltd.); Dalou, Bashar (Dallous International, Inc.); Dalou, Ammar (S & A Mart, Inc.); Daoud, Ziad Steve (Zoo–Zoo Brothers, Inc.); DeLizio, Bill (Bill DeLizio); Deluca, Ronald (S & S Shell, Inc.); Dennig, Raymond (Raymond Dennig); Deriss, Najef (Najef Deriss & Saied Hamidi); Deter, Robert (Robert Deter); Detterman, Joe (JCD, Inc.); Dhanani, Shoukat (Amin Enterprises, Inc., D & D International, Inc., S & A Oil Company, Inc.); Diaz, Carlos (Carlos Diaz); Dietz, Sr., James (J & J Shell Food Mart, LLC); DiGiacomo, Daniel (Daniella Manufacturing, Inc.); Diguiseppi, Stanley (Pancoast & Small, Inc.); Dikmen, Dursun (Dikmen, Dursun; Dikmen Enterprises, Inc.); Dimakopoulos, Laura (A–L Ventures, Inc.); Domingo, Carlos (Carlos Domingo); Dominguez, David (Alexa Corp.); Donohue, Timothy (Donohue Enterprises, Inc.); Dotto, Randall (70 Doc Corp.); Dula, John (John Dula); Dula, Donald (J & D Dula, Inc.); Ebrahim, Sami N. (Modern Pyramid, Inc.); Economides, Gus (Economides, Inc.); Egan, Harold, (Egan Enterprises, Inc., Harold Egan); Eiserloh, Joseph (Joseph R. Eiserloh); Elanges, Dean (M & M Elanges, Inc.); Elmalki, Osama (Inland Pacific Petroleum, Inc.); Ezanidis, Georgios (Ezanidis Brothers Enterprises, Inc.); Ezanidis, A. (Ezanidis Enterprises, Inc.); Fadakar, Farshid (Farshid Fadakar & Shahram "Sean" Zarrinkouh); Farhat, Houssen (Houssen Farhat); Farias, Enrique (Henry's Shell Stations, Inc.); Fein, Jim (J & D Fein Enterprises, Inc.); Feury, Sieg (L.P.Shell, Inc.); Fischer, Ernest & Paula (E & P Enterprise, Inc., E & P Enterprise, Inc. III); Florentis, Maria (Intershell, Inc.); Fodor, David (David E. & Marie A. Fodor); Francisco, German (North Bergen, Inc.); Francisco, Jr., Celestino (C & C Francisco Shell, Inc.); Francisco–Sosa, Maura (Octagon Shell, Inc.); Frantzeskakis, Nick (Fondren Service, Inc.); Fratturo, Frank (FLK Enterprises, LLC); Frederick, William (WRF Enterprises); Frisch, James (Frisch Enterprises, Inc.); Fullington, Keith (Keith Fullington); Gadsden, Marshall (Gadsden Enterprises, Inc.); Garoyan, Hagop (Rt. 23 Shell, Inc.); Getta, John (L & S Auto Care, Inc.); Giannopoulos, Diamandi (Diamandi Giannopoulos); Gmeiner, Thomas (Bridgeview Car Wash, Inc.); Gorman, Glen (Tinley Park Shell, Inc., Glen Gorman); Griffith, Arthur (A.D. Griffith, Inc.); Grivon, Michael (River Oaks Car Care Center, Inc., Many Pines Shell, L.L.C., West Loop Shell, L.L.C., Woodlands Shell, L.L.C.); Gruppuso, Dominick (Central Avenue Shell Corp.); Guenther, Carolyn (Garnerville Shell, Inc.); Guleria, Manjit (MSSG Associates, Inc.); Guzel, Huseyin (Stelton Service Station, Inc.); Habhab, Al (Eleven & Lahser Service, Inc.); Habhab, Habib (Grand River & Power Shell); Habhab, Hussein (Sam's Shell, Inc.); Habhab, Ghaleb (New H & H Corporation); Hackett, Martin (Martin Hackett, M.H.H. Ltd.); Hadid, Safaa (Orchard 10 Miles Service, Inc.); Hanna, Sherif (Sherif Auto Care, Inc.);

Harajli, Nabil (H2Oil, Inc.); Harajly, James (James Service Station); Harb, Hassan (Green 8 Mile, Inc.); Harp, Aly (I-94 Shell, Inc.); Harp, Hassen (Fellows Creek Shell, Inc., Hassen Harp); Harp, Aly (Boulevard Shell, Inc.); Harris, Charles (Harris Big Hill Shell, Inc.); Havlena, Raymond (Havlena's Serv. Ctr., Inc.); Heinemann, Jeffrey (Enterprises by Heinemann); Hill, David (David Hill for Island Shell, Inc.); Hoang, Anh (Hoang Food Mart, Inc.); Hoerath; Arthur (Westerville Self Service, Inc.); Hooda, Jack (Hooda Corporation, Inc.); Howard, Gerald (Oradell Auto Care, Inc.); Hrydziuszko, Ron (Ron Hrydziuszko); Huber, Jim (E & H Automotive, Inc.); Hudson, Frank (17 and Rochester Shell, Inc.); Hunter, Warren (Hunter–Doan, Inc.); Huntzicker, Dan (Dan Huntzicker); Hyder, Msalim (Sonia & Anil Corp., Inc.); Issa, Amila (Rahim, Inc.); Jackson, Elvis (Elvis Jackson); Jacobs, David (Jacor Enterprises, Inc.); Jamshedji, Aspy (Ahura Corporation); Janokowicz, Walter (Lockport Oil Corporation f/k/a West Suburban Oil Corp.); Jivani, Inayat (Aslam & ASIF International, Inc., Tausif International, Inc.); Johnston, Bruce (BVJ, Inc.); Joyce, Donald (Do Gas Shell, Inc.); Kantar, Riad (The Haneen Corporation); Karaali, Alper (Karaali Corp.); Karimi, Seyed (Seyed Karimi); Katopodis, Danny (Judan, Inc.); Kazilas, Fivos (Fivos Kazilas); Keaton, Roger (RMK Enterprises Illinois, Inc., Roger Keaton); Keith, Douglas (Douglas Keith); Kennedy, Peter (Taconic Shell, Inc.); Kenney, Thomas (Betran, Inc.); Kernan, Lola (Jim's Clearview Shell, Inc.); Khalaf, Khalaf (Khalaf Khalaf); Khaleq, Hassan (Hassan A. Khaleq); Khaleq, Hakam (Hakam Abdel Khaleq); Khaleq, Muhsen David (Muhsen David Khaleq); Khaliq, Ishan Abdel (Abuzaid Petroleum, Inc.); Khordaji, Abbott (AAK Investments, Inc., Blalock Services Center, Inc.); Khordaji, Adam (Telco, Inc.); Kiger, Dion (Kiger Enterprises, Inc.); Kilic, Kenan (Kenan Kilic); Kim, Don (Don Kim); Kim, Suk Am (Suk Am Kim); Kirkland, John (John Kirkland); Kirschner, Tony (Northshore Shell Car Wash, Inc.); Klass, William (B & C Auto Service, Inc.); Koborsi, Hanna (Kasro, Inc.); Koumoulos, Steve (Ella Services, Inc., Harwin Services, Inc.); Kumbalasiri, Preda (S.K.P., Inc.); Kummer, Theodore (Theodore B. Kummer); Kurter, Sami (Norwood Gas & Co., Inc., Sami Kurter); Kyle, Sr., John (North Shore Shell, Inc.); LaManna, Jr., Ernest (Ernest LaManna, Jr.); Lambton, Kenneth (Lambton's Service, Inc.); Langone, John (John Langone and Tony Dimango); Larsen, Steven (Larsen's 37, Inc.); LaVigne, Kenneth (LaVigne Services, Inc., K.C. LaVigne, Inc.); LaVigne, Jr., Terry (T & R Auto Service Corp.); Le–Nguyen, Jodi (Nguyen Oil Company, Inc.); Ledbetter, Mark (Mark Ledbetter); Lerdsuwanrut, Saksit (Lerdsuwanrut, Saksit); Lesniak, Laura (Tal/Cum Shell Service); Leverenz, Edward (Interstate Shell Inc.); Livengood, Delbert (Deceased) (Livengood, Inc.); Louras, Peter (Greenwood Central, Inc.); Mackenzie, Hugh (Fairfield Brake and Wheel, Inc.); Malinsky, Peter (Minsky Enterprises, Inc.); Malke, Joseph (Teaneck Shell, Inc.); Manjikian, Abraham (Eastway, Inc.); Marshall, Robert (Bob Marshall Enterprises, Inc.); Martini, Charles (Cherry Tree Holding, Inc.); Marx, Darrell (12 & Halstead Rd. Service Center, Inc., Marx Auto Car Centers, Inc.); Mauro, Dale (Bricom, Inc.); McGroarty, Michael (Michael H. McGroarty, Inc.); Melchiorre, Michael (Michael A. Melchiorre, Inc.); Messick, James (Messick Enterprises, Inc.); Mirgorodsky, Gennady (Dagen, Inc.); Mirza, Michael (Michael Mirza); Mousa, Rashid (Echo Enterprises, Inc.); Moustakis, Dionyssios (Dionyssios Moustakis); Mullins, Hugh (Hugh Mullins);

Nabi, Ihtsham (Ihtsham Nabi & Nazma Nabi); Nalu, William (Nalu Enterprises, Inc.); Nasser, Moses (Moses & Marlene Nasser); Nehme, Adib (Adib Nehme); Nemry, Naim (Nemry, Inc., Nemry, Naim A.); Neumayer, Charles (Wil–Ridge Shell Service, Inc.); Nguyen, Tiffany (Trinh Enterprises, Inc.); Nguyen, Chris–Thuong (Thuong Services, Inc., Tiffany Nguyen, Inc.); Novak, Carl (Novak's Shell, L.L.C.); O'Brien, Ralph (R.O.B. Enterprises, Inc.); O'Connell, Thomas (Bay Pointe Auto Wash, Inc., Orchard/14 Car Wash, Inc.); O'Neill, Douglas (MPS Enterprises, Inc.); O'Rourke, James (O'Rourke Enterprises, Inc.); Onassis, Christos (Christos Onassis); Orban, John (Orban Food Mart, Inc.); Orr, John (Either–Orr, Inc.); Oyster, M.R. (M.R. Oyster, Inc.); Paglini, Joseph (Greenwood Service Center); Palmer, Michael (Michael Palmer); Papavasiliou, Theofilos (Theofilos Papavasiliou); Parrett, Tom (Tom Parrett); Patel, Jay Prakash (Natraj, Inc.); Patel, Kirit (C. Mani Corp., Inc.); Patel, Jayesh (Jayesh, Inc.); Patel, Arvind (Arvind, Inc.); Patel, Vasudev (Vasudev Patel); Pavka, Jim (Jim Pavka); Peacock, Kenneth (JP Enterprises, Inc.); Pearson, Mark (Mark Pearson); Peffer, Leonard (L.E.P., Inc.); Perezous, George (Westbury Shell, Inc.); Perlman, Michael (7505 Spencer, Inc.); Petrino, Mark (Mark R. Petrino); Platis, John (John Platis); Platke, Ronald (Ronald Platke); Poonawala, Shiraz (SYP Enterprises, Inc.); Porter, Brian (Multi–Service Ctr. Shell, Inc.); Price, John (John Price for John Price, Inc.); Priest, Don (Don Priest); Prior, Keith (Westfield Food Mart, Inc.); Ptasznik, Gary (Gary Ptasznik); Radwan, Ahmed (Lucky Oil Company, Inc., Inland Pacific Petroleum, Inc.); Raftery, William (I.A.T., Inc.); Ramin, Mehrdad (Mehrdad Ramin & Mehri Ramin); Rasha, Najeb (Rasha & Son, Inc.); Rasool, Mustafa (MAT Enterprises, Inc.); Rast, Michael (Michael Rast); Ratonel, Lorna (Lorna B. Ratonel Enterprises, Inc.); Rauth, Jr., Frank (Frank E. Rauth, Jr.); Reed, William (William & Carol S. Reed, Reedy Oil); Reeves, Jack (Jack Reeves Trucking, Inc.); Rickenbacker, John (John Rickenbacker); Robson, W.G. (Dublin Sohio, Inc.); Rossini, Sr., Robert (Q.L.S. Corporation); Roumantzas, Spiros (Spirantzas, Inc.); Saadi, Nabil (Sand, Inc.); Samani, Peter (Aramson, Inc.); Samarneh, Monther (Monther Samarneh); Samuels, David (David A. Samuels); Sandhu, Pavittar (Sandhu Service, Inc., Palmyra Gas & Food, Inc., PS Shell, Inc.); Schladt, Anna (Mike Anna, Inc. f/k/a Golf–Mil Shell, Inc.); Schlitt, Don (Don E. Schlitt, Inc.); Schocker, William (William Schocker); Scieneaux, Herman (Gentilly Service, Inc.); Senawi, Janan (Dounia Enterprises, Inc., Senawi Enterprises, Inc., David's Enterprises, Inc.); Sfondeles, George (Majestic Union 76 Corp.); Shabaneh, Sameh (Shabaneh, Sameh); Shaya, Salah (Shaya, Inc.); Shea, Dan (Dan Shea); Shriner, James (Broad & James, Inc.); Shtayyeh, Hish (Landen Food Mart, Inc.); Shumlak, Moseh (Moshe, Inc.); Siha, Samuel (St. Mina K, Inc.); Sirchio, Bruce (G.I.O., Inc.); Skruba, Charles (C. Skruba, Inc.); Snono, Maykel (Snono Shell, Inc.); Sooy, Richard (Sooy, Inc.); Spangler, Buck (Reynoldsburg Center Shell, Inc.); Speed, Ed (Walnut Hill Enterprises, Inc.); Steinbrunner, Jack (Jack Steinbrunner); Stevens, Joe (Busse Woods Shell, Inc.); Stevenson, Jerry (Main and McNaughten, Inc.); Stewart, Jerry (Jerry K. Stewart, Inc.); Stohrer, Robert (Stohrer Brothers, Inc.); Stohrer, Sr., D.G. (Wall Shell Service, Inc.); Sturm, William (Milwaukee Ballard Service, Inc.); Summers, Leonard (Grand Island Shell, Inc.); Syal, Krishana (K & V Services); Talib, Peggy (SAMPS, L.L.P.); Tarbel, Christopher (Tarmart, Inc.); Tessema, Teshome (Teshome Shell,

Inc.); Tidemann, David (Lott's Service, Inc.); Trabbie, James (James Trabbie); Treacy, Richard (Landing Gas Services); Turnberian, Abraham (Abraham Turnberian); Uguccioni, Thaddeus (Double–U Enterprises); Uguccioni, Howard (Service Station Management, Inc.); Varcados, Jack (Jack John Varcados Shell, Inc.); Varcados, Anthony (Varcados Brothers Shell); Velasco, Ricardo (Ricardo A. Velasco); Verdesco, Sergio (Verdesco, Sergio); Virani, Feroz (F & J, Inc.); Vo, Hung (Vo, Hung, Hung Vo Enterprises, Inc.); Volpini, Charles (Volpini & Sons, L.L.C.); Watkins, Willie (Watkins Shell, Inc., W.E. Watkins, Inc., Willie Watkins); Weekley, Beverly (Beverly Weekley); Weissmann, Joseph (Joseph Weissmann, Inc., Terra Cotta, Inc.); Wilson, Paul (Fairview Auto Care, Inc.); Yehia, Hussein (HYZ Enterprises, Inc., Worldwide 2000, Inc., Shelco, Inc.); Yildirim, Eyup (Sakarlar Enterprises, Inc.); Young, Thomas (Thomas Young); Young, Timothy (Thomas Young Corp.); Zarrinkouh, Shahram (Sean) (Shahram Zarrinkouh); Zebis, Tom ˑ (Zebis Enterprises, Inc.); Zqaihi, Tawfig (T & H Enterprises, Inc.).