Tom W. **FETTER** on Behalf of himself and all other similarly situated individuals in Texas, Appellant,

v.

**WELLS FARGO BANK TEXAS, N.A.,** f/k/a Norwest Bank Texas, N.A., and Wells Fargo Services, Inc., f/k/a Norwest Services, Inc., Appellees.

No. 14–02–00480–CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 10, 2003.

Mike Johanson, Christopher Michael Volf, Sugar Land, Richard L. Tate, Michael E. Orsak, Richmond, and Benjamin Ray Bingham, San Antonio, for appellants.

J. Michael Lytle, Richmond, James Keith Russell, and Jeff Joyce, Houston, for appellees.

Panel consists of Justices JOHN S. ANDERSON, FOWLER, and SEYMORE.

## MAJORITY OPINION

JOHN S. ANDERSON, Justice.

Appellant Tom W. Fetter sued appellees Wells Fargo Bank Texas, N.A., f/k/a Norwest Bank Texas, N.A., and Wells Fargo Services, Inc., f/k/a Norwest Services, Inc., for breach of contract and breach of the Uniform Commercial Code's duty of good faith. *See* TEX. BUS. & COM.CODE ANN. § 1.203 (Vernon 1994).[1] The lawsuit, in which Fetter sought only a declaratory

---

1. Although Fetter brought the lawsuit as a class action, the trial court never ruled on Fetter's motion to certify the class.

judgment and permanent injunctive relief, arose from Wells Fargo's practice of posting checks from the highest dollar amount to the lowest dollar amount, a practice which Fetter contends increases the fees Wells Fargo collects for checks returned for insufficient funds ("NSF fees"). Despite stating there were factual issues about Wells Fargo's good faith in instituting the practice, the trial court concluded the express provisions of the UCC and the Account Agreement prevailed and granted Wells Fargo's motion for summary judgment, dismissing Fetter's claims with prejudice.[2]

In this case of first impression, we agree that the express language of the Account Agreement and UCC section 4.303(b),[3] preclude Fetter's claims as a matter of law. Accordingly, we affirm.

## DISCUSSION[4]

### *Standard of Review*

 In a single issue, Fetter challenges the trial court's order granting Wells Fargo's motion for summary judgment. The purpose of summary judgment is to eliminate patently unmeritorious claims or untenable defenses; it is not intended to deprive litigants of their right to a full hearing on the merits of any real issue of fact. *Gulbenkian v. Penn,* 151 Tex. 412, 416, 252 S.W.2d 929, 931 (1952). The movant for summary judgment has the burden to show there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548

(Tex.1985). When deciding whether there is a disputed material fact issue precluding summary judgment, the appellate court must take as true all evidence favorable to the non-movant. *Id.* at 548–49. The reviewing court must indulge every reasonable inference in favor of the non-movant and resolve any doubts in its favor. *Id.* at 549.

As a defendant moving for a traditional summary judgment, Wells Fargo assumed the burden of showing as a matter of law the plaintiff has no cause of action against it. *See Levesque v. Wilkens,* 57 S.W.3d 499, 503 (Tex.App.-Houston [14th Dist.] 2001, no pet.). Traditional summary judgment for a defendant is proper only when the defendant negates at least one element of each of the plaintiff's theories of recovery, or pleads and conclusively establishes each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997).

Because the propriety of summary judgment is a question of law, we review the trial court's decision de novo. *Brown v. Blum,* 9 S.W.3d 840, 844–45 (Tex.App.-Houston [14th Dist.] 1999, pet. dism'd w.o.j.). Similarly, matters of statutory construction are generally legal questions, subject to de novo review. *See State Dep't of Highways & Pub. Transp. v. Gonzalez,* 82 S.W.3d 322, 327 (Tex.2002).

### *The Live Pleadings and the Summary Judgment Proof*

In his live pleadings, Fetter characterized his cause of action as one for "breach

---

**2.** The trial court and the parties refer to Wells Fargo's Consumer Account Agreement variously as "the contract," the "Deposit Account Agreement," the "Depositor Agreement," and the "Deposit Contract." We refer to the document as the "Account Agreement."

**3.** *See* Tex. Bus. & Com.Code Ann. § 4.303(b) (Vernon 2002).

**4.** The factual and procedural background of the case is generally not germane to the analysis. We set forth the relevant historical and procedural facts in the course of the discussion.

of contract and breach of U.C.C. duty of good faith." He sought a judgment declaring (1) Wells Fargo posts checks from highest to lowest dollar amount for the sole purpose of increasing the NSF fees charged to customers, (2) this practice of posting to increase NSF fees is "illegal and improper," (3) this practice violates Wells Fargo's good faith obligations under the UCC, and (4) Wells Fargo should be permanently enjoined from this practice. He also sought a permanent injunction prohibiting Wells Fargo from continuing the practice.[5] Fetter alleged Wells Fargo's practice of posting checks from high to low "was not done for any legitimate business purpose, and was only instituted for the sole purpose of maximizing NSF fees charged to [Wells Fargo's] customers, including the Plaintiff, in violation of Defendants' duty of good faith pursuant to § 4.303 and § 1.203 of the UNIFORM COMMERCIAL CODE." Fetter further alleged that, by failing to perform its duties in good faith, Wells Fargo breached the Account Agreement, which Wells Fargo contends governs its relationship with Fetter.

In its motion for summary judgment, Wells Fargo argued Fetter's breach of contract claim fails as a matter of law because (1) UCC section 4.303(b) expressly allows banks to post checks "in any order," and (2) the Account Agreement expressly authorizes high to low posting. Wells Fargo argued Fetter's breach of the duty of good faith claim fails as a matter of law because (1) the good faith duty cannot be applied to rewrite the express terms of the Account Agreement, (2) there can be no breach of the good faith duty when a party acts in strict compliance with the terms of a contract, and (3) there is no independent

cause of action for breach of the good faith duty.

In support of its motion, Wells Fargo attached its representative's affidavit, stating, "The [Account] Agreement ... has been the agreement governing all consumer banking accounts at Wells Fargo Bank Texas, N.A., like Plaintiff Tom W. Fetter's, since April 2000." Wells Fargo also attached the Account Agreement, which provides, in part:

> Your account may be debited on the day an Item is presented by any means, including without limitation electronically, or at an earlier time based on notification received by the Bank that an Item drawn on your account will be presented for payment or collection. *The Bank may pay Items presented against your account in any order it chooses,* unless a particular order is either required or prohibited by law. *In particular, the Bank may, if it chooses, pay Items in the order of highest dollar amount to lowest dollar amount* (unless such a practice is specifically prohibited by an applicable state or federal law, rule, or regulation). The Bank may change the order of posting Items to your account at any time without notice to you. (Emphasis added.)

Fetter's response in the trial court and on appeal relies to a large extent on a State Bar Committee comment to UCC section 4.303, in which the committee opined that, although subsection (b) provides great discretion to the bank, the bank must continue to act in good faith, and, as an example, "a procedure designed to maximize the number of returned checks solely to increase returned check fees charged to customers would not be appropriate." TEX. BUS. & COM.CODE ANN.

---

**5.** At oral argument, Fetter's counsel characterized the lawsuit as one seeking only injunctive relief.

§ 4.303 state bar committee cmt. (Vernon 2002). In support of his response, Fetter attached, among other documents, Wells Fargo's responses to interrogatories, in which Wells Fargo stated the practice of posting checks from high to low was based on several factors, including (1) assuring customers their larger, and potentially more important checks (like mortgage and rent payments) will be paid before other checks, (2) potential increase in bank revenues from the generation of fees, and (3) the common use of the procedure in the banking industry.

### Analysis

■ **Rules of statutory construction.** This case requires us to construe UCC sections 1.023 and 4.303(b) together. A court's objective in construing a statute is to determine and give effect to the legislature's intent. *Tex-Air Helicopters, Inc. v. Galveston County Appraisal Review Bd.*, 76 S.W.3d 575, 581 (Tex.App.-Houston [14th Dist.] 2002, pet. denied). We presume the legislature intended the plain meaning of the words it used. *Id.* If possible, we must ascertain the legislature's intent from the language of the statute and not resort to extraneous matters for an intent not stated in the statute. *Id.* When interpreting a statute, we consider the entire act, its nature and object, and the consequence that would follow from each construction. *Id.* We must reject any statutory interpretation that defeats the legislative purpose. *Id.*

■ Under the Code Construction Act, we are required to construe uniform acts included in a code "to effect its general purpose to make uniform the law of those states that have enacted it." TEX. GOV'T CODE ANN. § 311.028 (Vernon 1998); *see MBank El Paso, N.A. v. Sanchez,* 836 S.W.2d 151, 153–54 (Tex.1992) (citing out-of-state case in construing UCC provision). Although the Official UCC Comments fol-

lowing the code provisions are not law, they are persuasive authority concerning interpretation of the statutory language. *HRN, Inc. v. Shell Oil Co.,* 102 S.W.3d 205, 212 n. 5 (Tex.App.-Houston [14th Dist.] 2003, pet. filed); *see Lockhart Sav. & Loan Ass'n v. RepublicBank Austin,* 720 S.W.2d 193, 195 (Tex.App.-Austin 1986, writ ref'd n.r.e.). With these principles in mind, we turn now to the statutory and contractual provisions at issue in the present case.

■ **Statutory and contractual provisions authorizing high to low posting.** UCC section 4.303(b) provides:

> Subject to Subsection (a), items may be accepted, paid, certified, or charged to the indicated account of a bank's customer *in any order* and before or after the bank's regular banking hours. A bank is under no obligation to determine the time of day an item is received and without liability may withhold the amount thereof pending a determination of the effect, consequence or priority of any knowledge, notice, stop-payment order, or legal process concerning the same, or interplead such amount and the claimants thereto.

TEX. BUS. & COM.CODE ANN. § 4.303(b) (Vernon 2002) (emphasis added).

■ Under the plain language of this section, the legislature has authorized Wells Fargo's practice of posting from high to low. In addition, UCC comment 7 explains,

> As between one item and another no priority rule is stated. This is justified because of the impossibility of stating a rule that would be fair in all cases, having in mind the almost infinite number of combinations of large and small checks in relation to the available balance on hand in the drawer's account; the possible methods of receipt; and

other variables. Further, the drawer has drawn all the checks, the drawer should have funds available to meet all of them and has no basis for urging one should be paid before another....

TEX. BUS. & COM.CODE ANN. § 4.303 cmt. 7 (Vernon 2002).[6]

Finally, the relationship between Fetter and Wells Fargo is governed by an Account Agreement. Under that Agreement Wells Fargo "may, if it chooses, pay Items in the order of highest dollar amount to lowest dollar amount (unless such a practice is specifically prohibited by an applicable state or federal law, rule, or regulation)."

Fetter, in essence, is asking this court to write this provision out of the Agreement, and authorization for the provision out of the UCC. The net effect of Fetter's requested change would render section 4.303 of Texas's UCC non-uniform, in derogation of the Code's purpose "to make uniform the law among the various jurisdictions." TEX. BUS. & COM.CODE ANN. § 1.102(b)(3) (Vernon 1994).

**UCC obligation of good faith and State Bar Committee Comment.** Fetter, however invokes UCC section 1.023, which provides, "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement." TEX. BUS. & COM.CODE ANN. § 1.203 (Vernon 1994). " 'Good faith' means honesty in fact in the conduct or transaction concerned." TEX. BUS. & COM.CODE ANN. § 1.201(19) (Vernon 1994).

▮▮ In addition, Fetter relies on a State Bar Committee Comment to section 4.303, which states,

Although the discretion given a bank by subsection (b) is great, the bank must continue to act in good faith in establishing its policies and procedures in this area. *For example, a procedure designed to maximize the number of returned checks solely to increase returned check fees charged to customers would not be appropriate.*

TEX. BUS. & COM.CODE ANN. § 4.303 state bar committee cmt. (Vernon 2002) (emphasis added). It is by virtue of this comment that Fetter contends he has raised a fact issue; and by virtue of this comment he distinguishes the foreign jurisdiction cases Wells Fargo cites.

As support for his contention that we view this comment as persuasive authority, Fetter cites *Destec Energy, Inc. v. Houston Lighting & Power Co.*, 966 S.W.2d 792, 795 n. 3 (Tex.App.-Austin 1998, no pet.). The *Destec* court, however, was analyzing a section of the Texas Revised Partnership Act (TRPA), and the court specifically observed that the comment at issue in that case was virtually identical to the bill analysis presented to the legislature for its use in considering enactment of the statute the appellate court was construing. *Id.* The TRPA, unlike the UCC, has no Official Comments. The only comments are the Bar Committee Comments, and these Comments carry some weight because they legislature had them when it enacted the TRPA.

Fetter has not presented this court with anything in the legislative history of section 4.303 that would suggest the legislature had the Bar Committee's comment before it when it enacted the provision permitting a bank to pay items "in any

**6.** We note Fetter seeks injunctive relief. Injunctive relief is an equitable remedy, and the complaining party must come into court with clean hands. *See Landry's Seafood Inn & Oyster Bar-Kemah v. Wiggins,* 919 S.W.2d 924, 927 (Tex.App.-Houston [14th Dist.] 1996, no writ). Here, it would appear Fetter wrote checks exceeding the available balance in his account.

order." In fact, the legislative history suggests otherwise, indicating the language permitting a bank to post items in any order predated the Bar Committee's comment by three decades. *See* Act of May 19, 1965, 59th Leg. R.S., ch. 721, § 4–303, 1965 Tex. Gen. Laws 1, 96 (stating "items may be ... paid ... in any order convenient to the bank") (subsequently codified in Texas Business and Commerce Code and amended; current version at TEX. BUS. & COM.CODE ANN. § 4.303 (Vernon 2002)). *Cf.* Daryl B. Robertson, *Report of the Commercial Code Committee of the Section of Business Law of the State Bar of Texas on Revised UCC Articles 3 and 4*, 47 BAYLOR L.REV. 427, 499–500 (1995) (date of which suggesting comment was not before the legislature until 1995, when the 74th Legislature deleted the words "convenient to the bank" by the Act of May 28, 1995, 74th Leg., R.S., ch. 921, § 4, sec. 4.303, 1995 Tex. Gen. Laws 4582, 4638). Because the State Bar Committee Comment was not before the legislature when it enacted the language permitting a bank to pay items "in any order," we do not view it as persuasive in analyzing the issue in the present case.

 **Texas case law.** In the context of a case in which the plaintiff claimed damages for a violation of UCC section 1.203, the supreme court observed, "In the absence of a specific duty or obligation [in the contract] to which the good-faith standard could be tied, section 1.203 will not support [the plaintiff's] claim for damages." *N. Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 606–07 (Tex.1998). As the Corpus Christi Court had previously explained, the UCC "duty of good faith and fair dealing is aimed at making effective the agreement's promises." *Adolph Coors Co. v. Rodriguez*, 780 S.W.2d 477, 482 (Tex.App.-Corpus Christi 1989, writ denied), *cited with approval in N. Nat. Gas*,

986 S.W.2d at 606. Moreover, if the factfinder may write into a contract other terms it believes are fair under the circumstances, any contract is subject to being rewritten to better suit the court's or the jury's view of what the parties should in "good faith" have included in the agreement, regardless of what the parties actually did or did not provide. *Id.* at 482. As discussed above, in the present case, Wells Fargo included within the Account Agreement the specific provision that Wells Fargo could, if it chose, "pay Items in the order of highest dollar amount to lowest dollar amount (unless such a practice is specifically prohibited by an applicable state or federal law, rule, or regulation)."

Fetter, however, points to *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, as "instructive." *See* 673 S.W.2d 558 (Tex. 1984). La Sara involved construction of UCC section 4.406. As the *La Sara* court explained regarding the version of section 4.406 then in effect:

> Section 4.406 places a duty upon the depositor to promptly examine his bank statement and report to the bank the discovery of any "unauthorized signature or any alteration." *Id.* § 4.406(a). If the depositor fails to comply with this duty, the bank is protected from loss so long as it has exercised ordinary care and paid the item in good faith. *Id.* § 4.406(b), (c). If a depositor does not report an unauthorized signature within one year from the time the statement and items are made available to him, the bank's care or lack thereof becomes irrelevant, *id.* § 4.406(d); at that point, the customer's only claim is that the item was not paid in good faith. *Id.* § 4.406(d).

*Id.* at 561–62 (footnote omitted) (citing Act of May 25, 1967, 60th Leg., R.S., ch. 785, § 1, sec. 4.406, 1967 Tex. Gen. Laws 2343, 2458) (since amended, current provi-

sions at TEX. BUS. & COM.CODE ANN. § 4.406 (Vernon 2002)). Thus, section 4.406 is a comprehensive section setting forth a customer's duties and affording the bank protection from loss, except when the bank does not act in good faith in paying a check on an unauthorized signature.

In opening its account at First National, La Sara also filed a corporate resolution with the bank providing that any two of four authorized signatories could sign checks for the corporation. *La Sara Grain,* 673 S.W.2d at 561. Harold Jones, La Sara's general manager, was one of the authorized signatories on the account. *Id.* First National subsequently honored checks bearing *only* Jones's signature. After firing Jones, La Sara discovered he had embezzled over $300,000. *Id.* La Sara contended the bank actually knew Jones's signature alone was insufficient, and, in paying the checks anyway, did not act in good faith. *Id.* at 563. The bank president testified at trial that the bank would know of anything it had in its files. *Id.* La Sara's corporate resolution specifying the two-signature requirement was in the bank's files. *Id.*

Based on this evidence, the court concluded the bank did not act in good faith in accepting the checks with only one authorized signature. *Id.* In reaching this conclusion, the court relied on the fact that the bank knew that two signatures were required and that the checks bore only one signature. *Id.* Thus, in *La Sara,* the bank arguably acted contrary to the agreement it had with the customer. Moreover, the UCC section at issue contained the good faith requirement as an express limitation of the protection it provided to the bank.

*La Sara* is not instructive for deciding a case involving different UCC provisions and a bank acting in accord with the agreement it has with the customer.

**Case law from other jurisdictions.** Although this is an issue of first impression in Texas, courts in other jurisdictions have uniformly concluded that posting checks from high to low does not contravene the UCC good faith provision at issue in the present case. *See Hill v. St. Paul Fed. Bank for Sav.,* 329 Ill.App.3d 705, 263 Ill. Dec. 562, 768 N.E.2d 322 (2002) (on review of order granting motion to dismiss complaint); *Daniels v. PNC Bank, N.A.,* 137 Ohio App.3d 247, 738 N.E.2d 447 (2000) (same); *Smith v. First Union Nat'l Bank of Tenn.,* 958 S.W.2d 113 (Tenn.Ct.App. 1997) (same).[7] In *Hill,* the court rejected an argument virtually identical to Fetter's argument in this case:

> The banks' account agreements contained provisions allowing overdraft fees. Plaintiffs are alleging that the high-to-low posting order chosen by defendants was improper because it was inconsistent with the reasonable expectations of customers and because it was chosen to maximize the banks' profits. Plaintiffs have not brought an independent cause for the breach of good faith but have alleged that defendants have failed to perform the obligation to assess overdraft fees in good faith.
>
> . . .
>
> Although defendants' account agreements do not specify the posting order that they will use, section 4–303(b) allows defendants to choose any method.

---

7. The *Smith* court specifically concluded that, when a party is acting under authority expressly granted by statute and is not exceeding that authority, there is, as a matter of law, no breach of either the common law duty of good faith in the performance of the contract or a violation of the statutory requirement of good faith. *Smith v. First Union Nat'l Bank of Tenn.,* 958 S.W.2d 113, 117 (Tenn.Ct.App. 1997). The *Hill* court cited *Smith. Hill v. St. Paul Fed. Bank for Sav.,* 329 Ill.App.3d 705, 263 Ill.Dec. 562, 768 N.E.2d 322, 326 (2002)

The legislature must have understood the broadness of the phrase "any order." It must have recognized that banks could choose a method that benefitted them—as in the case where posting higher amounts first results in a greater number of overdraft fees.

There can be no lack of good faith in acting as authorized by the UCC. See *Washburn v. Union National Bank & Trust Co. of Joliet,* 151 Ill.App.3d 21, 27, 104 Ill.Dec. 242, 502 N.E.2d 739 (1986) (having found that the sale of collateral was commercially reasonable within the meaning of section 9–507(2) of the UCC, the sale could not violate a bank's duty of good faith). Even if plaintiffs proved that the primary motivation of defendants was to maximize profits, their motive is irrelevant because their choice of the high-to-low posting method was authorized by the UCC.

*Hill,* 263 Ill.Dec. 562, 768 N.E.2d at 326–27.[8]

Fetter argues *Hill* is distinguishable based on the State Bar Committee Comment to the Texas UCC section 4.303. For the reasons discussed above, we do not find that comment persuasive authority.

Fetter has cited no reported case in which a court has held a bank violates the UCC duty of good faith when it implements, performs, or enforces a high to low method of posting checks. We have found none.

We overrule Fetter's sole issue.

We affirm the judgment of the trial court.

WANDA McGEE FOWLER, J., concurring.

WANDA McKEE FOWLER, Justice, concurring.

I agree completely with the majority opinion. I write only to explain the differences between this case and another U.C.C. case recently issued by this court, in which we held that a fact issue existed on whether a party acted in good faith in setting an "open price term." *See HRN, Inc. v. Shell Oil Co.,* 102 S.W.3d 205 (Tex. App.-Houston [14th Dist.] 2003, n.p.h.); TEX. BUS. & COM.CODE ANN. § 2.305. In *HRN,* lessee dealers of Shell alleged that Shell was charging them unreasonably high prices for gasoline, and that it did this with the intent of running them out of business. *Id.* at 211. Shell defended, claiming that it charged its dealers a price comparable to those charged by its competitors. *Id.*

Relying on a U.S. Circuit Court opinion from the Fifth Circuit that involved nearly identical facts and issues, we held that, even though Shell's price might be comparable to its competitors', Shell was required to set the price in good faith, and that a fact issue existed on that point. *Id.* at 215. In reaching this conclusion, we relied on the plain language of section 2.305 and on the official U.C.C. comment to the section. *Id.* at 211–215. The plain language of section 2.305(b) requires that an open price term—described as a "price to be fixed by the buyer or seller"—must be fixed in good faith. *Id.* at 211. The comment to section 2.305 states that normally a "posted price" or "market price" will satisfy the good faith requirement, but, it noted that whatever price is set must be set in good faith. *Id.* at 212. The dealers in *HRN* presented some evidence by which a jury could conclude that

---

**8.** The facts in the case *sub judice* are even stronger than those in *Hill* because Wells Fargo has language in its Account Agreement specifically permitting high to low posting in addition to the authorization provided in UCC section 4.303(b).

Shell—allegedly desiring to switch to Shell-owned gas stations—was setting its price to force its dealers out of business. *Id.* at 214–15. As a result, we found a fact issue existed and remanded the case for further proceedings or a trial.

This case is very different from *HRN*, and that is why we have held that no fact issue exists, even though we held one existed in *HRN.* There are several ways the cases are different.

First, the U.C.C. sections themselves differ. Section 4.303, at issue here, expressly allows a bank to post checks in any order. Although the U.C.C. section in *HRN* allowed parties to use "open price terms," it required that the terms be set in good faith. No such requirement exists in section 4.303.

Second, the official U.C.C. comments for the two sections are very different. The comment for 4.303 expressly notes that no priority rule for paying checks is stated in the section and that it would be impossible to state a rule that was fair in all cases. TEX. BUS. & COM.CODE ANN. § 4.303 cmt. 7 (Vernon 2002). The comment acknowledges the futility of choosing a priority system that is fair to all, and so it acknowledges that any order is acceptable, acknowledging also that the drawer should have funds available for all the checks written. In contrast, the U.C.C. comment involved in *HRN* did not approve of all price settings; it approved only of those set in good faith. Thus, consideration of good faith is part and parcel of the U.C.C. comment for section 2.305 (in *HRN* ), but not in 4.303 (this case). Although the State Bar Comment to 4.303 does attempt to add good faith consideration into section 4.303, as we note in the majority opinion, our legislature did not approve that language, and we do not find it persuasive. And, in fact, a plain reading of section 4.303 would lead one to believe that good faith is not part of the equation.

The final difference between the two cases lies in the relationships between the parties and the control Fetter and the dealers exercised over their fates. Here, Fetter—the drawer/plaintiff—was on notice through his contract with the bank that it could pay checks in order of highest to lowest. If he did not like that system, he could choose to take his business to another bank. In addition, the fees were only charged if Fetter did not have enough money in the bank to cover the checks he had written. Unlike Fetter, the dealers in *HRN* alleged that they were captive buyers who were required by contract to buy gas from Shell. Moreover, unlike Fetter, who was partly responsible for the fees he had to pay, the dealers did not control whether they incurred ill effects from *Shell's* alleged bad acts.

In short, the majority opinion is correct. Unlike *HRN*, neither the applicable U.C.C. provisions nor the parties' agreement may be read to impose a duty of good faith on Wells Fargo's check-posting practices.