In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-22-00376-CV
_____

INTERFLOW FACTORS CORPORATION, Appellant

V.

HILTON HOLDINGS, LLC, Appellee

_____

On Appeal from the County Court at Law No. 1
Jefferson County, Texas
Trial Cause No. 136,199

_____

**MEMORANDUM OPINION**

This case involves a dispute between a factoring company and an account debtor.[1] Interflow Factors Corporation ("Interflow") purchased accounts owed to Sharpe Security & Investigations, LLC, d/b/a Gulf Coast Security & Investigation ("Gulf Coast"), which executed a "Factoring Agreement" assigning Interflow its

---

[1]Factoring is a process by which a business sells, at a discount, the right to collect money before the money is paid. *Houston Lighting and Power Co. v. Wharton*, 101 S.W.3d 633, 636 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

1

rights to certain invoices that Hilton Holdings, LLC ("Hilton") was required to pay Gulf Coast. After Hilton received notice of Interflow's assignment, Hilton at some point directly paid invoices to Gulf Coast instead of Interflow, and Interflow sought to collect on those paid invoices. Interflow appeals the trial court's final judgment granting summary judgment in favor of Hilton and denying Interflow's summary judgment. For the reasons discussed below, we (1) reverse the trial court's summary judgment granting Hilton's Motion for Summary Judgment, (2) reverse the trial court's summary judgment denying Interflow's Motion for Summary Judgment, (3) render judgment in favor of Interflow for $155,152.58 on its claim that section 9.406 of the Uniform Commercial Code ("UCC") required Hilton to directly pay Interflow due to the assignment, and (4) remand the case to the trial court to determine the amount of prejudgment interest, costs, reasonable attorney's fees, and post-judgment interest that Interflow is entitled to, if any. *See* Tex. Bus. & Com. Code Ann. § 9.406(a).

## BACKGROUND

Hilton was in the business of selling furniture in Houston, Texas and hired Gulf Coast to provide security services at Hilton's place of business. Gulf Coast submitted invoices to Hilton for payment of its security services. However, Interflow purchased and was assigned certain accounts/invoices owed to Gulf Coast pursuant

2

to a Factoring Agreement, whereby the debtor, in this case Hilton, would make payments directly to Interflow instead of Gulf Coast. Initially, Hilton made payments directly to interflow, but at a later date and per the request of Gulf Coast, Hilton stopped making payments to Interflow and started making payments directly to Gulf Coast.

Interflow filed an Original Petition seeking damages from Hilton for breaching a contract and failing to pay certain Gulf Coast invoices that had allegedly been assigned to Interflow. Interflow alleged that in addition to the assigned invoices, the Factoring Agreement granted Interflow a lien on future account receivables Hilton owed to Gulf Coast regardless of whether they were factored by Interflow. It should be noted that the original term of the Factoring agreement was from June 21, 2013, through June 20, 2014. However, the "Term" of the agreement was to be continued and renewed for successive one-year periods unless notice of termination was given by either party.

Interflow factored invoices for Gulf Coast, which were owed by Hilton to Gulf Coast. However, Hilton was aware that payment of the invoices was owed to Interflow because a notice of Gulf Coast's assignment was printed on each invoice along with Interflow's address for payment. Interflow also provided Hilton a "Notice of Assignment" indicating that Gulf Coast assigned Interflow the right to collect

payment on present and future account receivables existing between Hilton and Gulf Coast and that future payment should be directed to Interflow. In addition, the Notice also provided that "This notice of assignment will remain in effect until Interflow Factors Corporation provided written notification withdrawing the notice."

Hilton initially made payment for invoices to Interflow. However, later payment of invoices to Interflow stopped, and Hilton then made payment of invoices to Gulf Coast. Interflow became aware that Hilton had paid invoices directly to Gulf Coast totaling $155,152.58. Interflow claimed that Hilton owed Interflow the sum of $155,152.58 because Interflow stood "in the shoes of Gulf Coast" to collect the balance owed, which Interflow argued Hilton was obligated to pay Interflow under section 9.406 of the UCC. *See id.* Interflow further alleged that by failing to pay the invoices, Hilton was estopped from asserting any defenses based on the improper payments it made to Gulf Coast. Interflow alleged that it demanded payment from Hilton, Hilton breached the contract by failing to pay, and Interflow suffered damages and was entitled to attorney's fees and costs. Interflow attached to its Plaintiff's Original Petition the Notice of Assignment; Hilton's account analysis; a demand letter from Interflow to Hilton for payments owed based on the Factoring Agreement; and the Affidavit of Dr. Keven J. Roy, the President of Interflow, who averred that for a period, Hilton made payments on factored and non-factored

4

invoices directly to Interflow but then stopped without explanation; and a demand letter from Interflow's attorney to Hilton regarding payment of the outstanding invoices, which was ignored.

Hilton filed a Motion to Transfer and Original Answer and explained that at some point the relationship between Gulf Coast and Interflow broke down due to Interflow suing Gulf Coast for failing to pay money owed under the Factoring Agreement. According to Hilton, Interflow also filed a series of cases against Gulf Coast's customers to attempt to collect money it believed Gulf Coast owed under the Factoring Agreement. Hilton explained that Interflow's counsel, Bill Richey, entered into a Rule 11 Agreement with Gulf Coast's counsel and agreed that Gulf Coast could continue to receive revenue directly for its security services regardless of whether Interflow had a proper claim to that revenue. Hilton further explained that it paid either Interflow or Gulf Coast the money it owed under its security services agreement with Gulf Coast, and when Gulf Coast failed to pay Interflow the money it collected from Hilton, Interflow sued Hilton. Hilton asserted the following affirmative defenses: payment of the full amount owed, waiver due to the Rule 11 Agreement, laches, ineffective notice, failure to provide proof of the assignment, fraud, and quasi-estoppel. Attached to Hilton's Original Answer is an email from Interflow's counsel, Bill Richey, to Jesse Corona, Gulf Coast's counsel, showing

5

that Richey agreed to a modification of a Letter Agreement Proposal which stated that Kevin Roy and Interflow would not take active steps to collect the accounts so Gulf Coast could attempt to repair any damage to their clients caused by Interflow's attempted collection activities.

Interflow filed a traditional Motion for Summary Judgment, arguing that it was entitled to summary judgment because there were no genuine issues as to any material fact concerning Hilton's liability to Interflow. Interflow stated that after Hilton received the Notice of Assignment, Hilton made direct payments to Gulf Coast totaling $155,152.58, and Hilton made no payments after receiving Interflow's demand letter. Interflow argued that it had a lien on the invoices that Hilton owed to Gulf Coast, and Hilton was aware of the Notice of Assignment and was obligated to make payments to Interflow under section 9.406(a). *See id.* Interflow further argued that Hilton was estopped from asserting any defenses based on the improper payments it made to Gulf Coast and not entitled to receive credit for any payments. Interflow explained that since the balance owed was undisputed, the matter should be resolved by summary judgment. Interflow attached the following evidence to its Motion: the Factoring Agreement; UCC Financing Statement; Contract between Hilton and Gulf Coast; Notice of Assignment; Hilton's account analysis; Letter from Bill Richey to Hilton; Affidavit of Kevin Roy; Affidavit of Bill

6

Richey; Hilton's Response to Request for Admissions; and Interflow's Original Petition.

Hilton filed a Response to Interflow's Motion for Summary Judgment, arguing that it paid Interflow directly for the invoices that had been assigned to it, but Interflow had no valid security interest in the remaining Gulf Coast invoices because those invoices were never assigned to Interflow, and as such, Interflow had no right to enforce its claim as an assignee against Hilton. Hilton alternatively argued that the notice assigning invoices to Interflow was not a binding obligation that required Hilton to pay Interflow for other invoices that were not assigned. Hilton argued that it should be granted summary judgment on Interflow's claim that it was obligated to pay Interflow due to the assignment, because in this case, Interflow's remedy for Gulf Coast's failure to pay its debts lies against Gulf Coast alone.

Hilton further argued that the Factoring Agreement did not qualify as a security agreement because although it mentioned "Security," the plain language of the Factoring Agreement shows the parties intended to execute another document that was to act as the security agreement. Hilton also argued that the fact that the Factoring Agreement includes a list identifying property that was to serve as collateral does not create a security agreement in that property. According to Hilton, Interflow's lack of a security agreement encumbering invoices issued by Gulf Coast

7

precludes it from having an enforceable security interest, thereby preventing it from being able to assert a lien claim against the invoices Hilton paid directly to Gulf Coast. Hilton alternatively argued that even if the Factoring Agreement qualified as a security agreement, it was insufficient for failing to sufficiently identify the security to which it allegedly applies.

Hilton explained that Interflow only identified one legal basis for its claim it was entitled to summary judgment, which was section 9.406(a) of the UCC, and that section allowed Interflow to demand that Hilton pay it directly on any bill that had been assigned to Interflow. Hilton maintained that Interflow admitted that Hilton paid all the assigned invoices but sought to enforce a lien against claimed security that was never assigned to Interflow. Hilton also argued that section 9.406(a) only applies if there is an assignment of property, which is not the case here, because Interflow only sought to enforce a lien against some future payment to be made. Hilton maintained that section 9.406(a) does not allow Interflow to force Hilton to pay money directly to Interflow to discharge the lien. Hilton further argued that Interflow should be quasi-estopped from pursuing its claims because the Rule 11 Agreement allowed Hilton to make payments to Gulf Coast. Hilton attached the following evidence to its response: Affidavit of Hilton Koch; contract between Hilton and Gulf Coast; the Factoring Agreement; letter from Interflow to Hilton;

8

Rule 11 Agreement between Interflow and Gulf Coast; and a January 2020 email from Interflow's counsel regarding his client's claims.

In the January 2020 email from Bill Richey to Drew Taggart, Richey stated that there was no specific assignment of the unpaid invoices because they did not exist when the Factoring Agreement was executed, and he explained that the current unpaid invoices were future receivables that were assigned by Gulf Coast to secure its obligation to Interflow. Richey asked Taggart if Hilton made any direct payments to Gulf Coast after receiving the Notice of Assignment. Taggart responded and notified Richey that he was to consider his email as a formal request under section 9.406(c) for proof that the assignment of the Hilton invoices had been made. *See id.* § 9.406(c) (stating that if requested by the account debtor, an assignee shall reasonably furnish proof that the assignment has been made, and unless the assignee complies, the account debtor may discharge its obligation by paying the assignor even if the debtor received the required notification of assignment). It should be noted Taggart's request was made after all the complained of payments were made from 2017 through 2018.

Hilton filed a traditional Motion for Summary Judgment, arguing that it was entitled to summary judgment because Interflow had no security interest in the Gulf Coast invoices that were never assigned to it and no right to enforce its claims as a

factor/assignee against Hilton. Hilton argued that the Factoring Agreement did not qualify as a security agreement or sufficiently identify the collateral securing the loan, the Notice of Assignment did not obligate Hilton to pay to discharge unassigned invoices, and Interflow's remedy is against Gulf Coast for failing to pay its debts. Hilton also argued that article 9.406(a) did not apply to Interflow's claimed lien on unassigned accounts because a lien against some future payment does not constitute an assignment of that payment to the lienholder. Hilton explained that Interflow's Rule 11 agreement with Gulf Coast allowed Hilton to pay Gulf Coast directly for the invoices about which it now complains. Hilton attached the following evidence to its motion: Affidavit of Hilton Koch; Factoring Agreement; February 2017 Notice of Assignment letter from Interflow to Hilton; August 2017 Rule 11 Agreement between Interflow and Gulf Coast; and January 2020 email from Bill Richey to Drew Taggart.

Interflow filed a Brief in Support of Plaintiff's Motion for Summary Judgment and attached additional summary judgment evidence. Interflow argued the Factoring Agreement was a security agreement granting it a security interest in future receivables owned by Gulf Coast, and the Factoring Agreement described the collateral as including, all present and future accounts, contract rights, and notes receivable. Interflow argued that despite making payments to Gulf Coast, Hilton

10

must still pay it for the unpaid invoices because section 9.406(a) prevented Hilton from claiming credit for the payments it made to Gulf Coast, and Interflow denied that it agreed Hilton could pay Gulf Coast directly. Interflow included additional summary judgment evidence which it argued showed that section 9.406(a) applied and that an assignment included a security interest. That evidence included a June 2017 email from Kevin Roy to Jon Stup of Hilton, in which Roy stated that he understood that Gulf Coast was no longer providing security services for Hilton, and Roy asked Stup to provide a list of outstanding invoices so he could close the account. In his reply email, Stup stated "Mr. Sharp with Gulf Coast said to mail everything to him, in Houston[,]" and Roy's response recommended that Stup please adhere to the Notice of Assignment sent by Interflow and inquired if Stub had made any direct payments to Gulf Coast.

The trial court denied Interflow's Motion for Summary Judgment, granted Hilton's Motion for Summary Judgment, and dismissed Interflow's claims against Hilton with prejudice.

**ANALYSIS**

In two issues, Interflow complains the trial court erred by granting Hilton's Motion for Summary Judgment and denying its Motion for Summary Judgment. We review summary judgment orders de novo. *Provident Life & Accident Ins. Co. v.*

11

*Knott*, 128 S.W.3d 211, 215 (Tex. 2003). The party moving for traditional summary judgment must establish that (1) no genuine issue of fact exists, and (2) it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). If the moving party produces evidence entitling it to summary judgment, the burden shifts to the non-movant to present evidence that raises a fact issue. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996). In determining whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). We review the summary judgment record "in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

When both parties move for summary judgment on the same issue and the trial court grants one motion and denies the other, the reviewing court considers the summary judgment evidence presented by both parties and determines all the questions presented. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). If the reviewing court determines that the trial court erred, the reviewing court typically renders the judgment the trial court should have rendered. *Id.* We must affirm the summary judgment if any grounds asserted in the

motion are meritorious. *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004).

**Hilton's Motion for Summary Judgment**

We first determine whether Hilton was entitled to judgment as a matter of law on its claim that the Factoring Agreement did not qualify as a security agreement or sufficiently identify the collateral securing the loan. *See* Tex. R. Civ. P. 166a(c); *Fielding*, 289 S.W.3d at 848. Section 9.102 of the UCC defines "security agreement" as "an agreement that creates or provides for a security interest." Tex. Bus. & Com. Code Ann. § 9.102(a)(74). "Security interest means an interest in personal property or fixtures which secures payment or performance of an obligation." *Id.* § 1.201(b)(35). "Collateral" is "the property subject to a security interest[,]" including, among other things, accounts and payment intangibles. *Id.* § 9.102(a)(12)(B). An "account" means "a right to payment of a monetary obligation . . . for services rendered or to be rendered[.]" *Id.* § 9.102(a)(2). A security agreement must define the collateral to enable the debtor and other interested persons to identify the property that the creditor may claim as security. *Carmel Fin. Corp., Inc. v. Castro*, 514 S.W.3d 291, 296 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (citation omitted); *see* Tex. Bus. & Com. Code Ann. § 9.203. A financing statement is the

instrument designed to notify third parties that there may be an enforceable security interest in the party. *Carmel Fin. Corp., Inc.*, 514 S.W.3d at 296 (citation omitted).

Article Nine of the UCC applies to any transaction, regardless of its forms, that creates a security interest in personal property or fixtures by contract, including a sale of accounts. *Morgan Bldgs. and Spas, Inc. v. Turn-Key Leasing, Ltd.*, 97 S.W.3d 871, 876 (Tex. App.—Dallas 2003, pet. denied) (citation omitted); *see* Tex. Bus. & Com. Code Ann. § 9.109(a)(3). "Generally, the test for creation of a security interest is whether the transaction was intended to have the effect as security, because parties must have intended that their transaction fall within the scope of Article Nine." *Morgan Bldgs. and Spas, Inc.*, 97 S.W.3d at 876 (citing *Superior Packing, Inc. v. Worldwide Leasing & Fin., Inc.*, 880 S.W.2d 67, 71 (Tex. App.—Houston [14th Dist.] 1994, writ denied)). We look to the transaction to determine if the parties intended to create a security interest in the type of property specified in section 9.102 of the Code for the purpose of securing payment of an obligation. *Id.* (citation omitted). "No formal wording is required, and the court, in arriving at the intent of the parties, should examine the substance of the documents in light of the circumstances of the case." *Id.* The intent of the parties is determined by examining "'the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'" *Id.* (quoting *Coker v.*

14

*Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). Documents executed contemporaneously for the same purpose and as part of the transaction should be read and construed together to determine the parties' intent. *Id.* (citing *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981)). Additionally, to create a security interest, the security agreement must describe the collateral with sufficient particularity to identify it. *Sanders v. Comerica Bank, Inc.*, 274 S.W.3d 861, 863 (Tex. App.—Fort Worth 2008, no pet.); *see* Tex. Bus. & Com. Code Ann. § 9.108. A description of collateral reasonably identifies the collateral if it identifies the collateral by category. Tex. Bus. & Com. Code Ann. § 9.108(b)(2).

The eighteen page Factoring Agreement includes a section titled "Security," which provides that to secure Gulf Coast's indebtedness to Interflow, Gulf Coast shall grant Interflow "a continuing security interest in the 'Collateral' as defined in and pursuant to the terms of a Commercial Security Agreement and certain other Related Documents, in form and satisfactory to [Interflow], to be executed by Seller contemporaneously herewith[.]" The Factoring Agreement lists the Collateral, which includes, among other items, equipment, accounts, inventory, and general intangibles, and the accounts included "[a]ll present and future accounts[,] contract rights, notes receivable, chattel paper, . . . [and] documents[.]" In addition, the Factoring Agreement further provided:

15

> Notwithstanding any provision to the contrary contained herein, the security interest granted by this security agreement secures the payment and performance of all the liabilities and obligations of the debtor to the secured party of every kind and description, due or to become due, now existing or hereafter arising. Debtor agrees that any such further or future indebtedness or obligation is reasonably within the contemplation of the parties hereto.

Gulf Coast agreed to execute financing statements, security agreements, and other documents which Interflow deemed necessary or desirable in order to create, maintain, perfect, or preserve the security interest in the Collateral in favor of Interflow.

The record also includes Interflow's UCC Financing Statement, which was filed in March 2016, and lists Gulf Coast as the debtor and Interflow as the secured party, and that statement provided that Gulf Coast granted unto Interflow a continuing security interest in the collateral, which included, among other things, "[a]ll present and future accounts[,] contract rights, notes receivable, chattel paper, . . . documents, together with any and all books of account . . . ." In addition, the UCC Financing Statement also and likewise provided:

> Notwithstanding any provision to the contrary contained herein, the security interest granted by this security agreement secures the payment and performance of all the liabilities and obligations of the debtor to the secured party of every kind and description, due or to become due, now existing or hereafter arising. Debtor agrees that any such further or future indebtedness or obligation is reasonably within the contemplation of the parties hereto.

Finally, the UCC Financing Statement states that Gulf Coast shall grant Interflow a security interest in the collateral as defined in and pursuant to the terms of a Commercial Security Agreement and certain other Related Documents, in form and substance satisfactory to Interflow, that Gulf Coast will execute contemporaneously herewith. The record also includes Gulf Coast's contract with Hilton for the period of June 23, 2016, through June 30, 2017.

After reviewing the transaction as a whole, we hold that the Factoring Agreement, as well as the UCC Financing Statement, qualifies as a security agreement and that it reasonably identifies the collateral by category. *See id.* §§ 9.102(a)(74), 9.108(b)(2); *Sanders*, 274 S.W.3d at 863; *Morgan Bldgs. and Spas, Inc.*, 97 S.W.3d at 876. Accordingly, we conclude that Hilton was not entitled to judgment as a matter of law on its claim that Interflow had no security interest and no right to enforce its claims against Hilton. *See* Tex. R. Civ. P. 166a(c); *Fielding*, 289 S.W.3d at 848.

We next determine whether Hilton was entitled to judgment as a matter of law on its claims that the Notice of Assignment did not obligate Hilton to pay to discharge unassigned invoices and that section 9.406(a) did not apply to Interflow's claimed lien on unassigned accounts because a lien against some future payment does not constitute an assignment of that payment to the lienholder. Hilton argued

17

that section 9.406(a) only applies to an assignment of factored invoices and not a claimed lien against a security interest. Hilton maintained that section 9.406(a) does not allow Interflow to force Hilton to pay money directly to Interflow to discharge the lien.

"Under the Code Construction Act, we are required to construe uniform acts included in a code 'to effect its general purpose to make uniform the law of those states that have enacted it.'" *Fetter v. Wells Fargo Bank Tex., N.A.*, 110 S.W.3d 683, 687 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (quoting Tex. Gov't Code Ann. § 311.028); *see also Sw. Bank v. Info. Support Concepts, Inc.*, 149 S.W.3d 104, 110 (Tex. 2004) (quoting Tex. Gov't Code Ann. § 311.028). Section 1.103 of the UCC states:

(a) This title must be liberally construed and applied to promote its underlying purposes and policies, which are:

(1) to simplify, clarify and modernize the law governing commercial transactions;

(2) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and

(3) to make uniform the law among the various jurisdictions.

(b) Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

18

Tex. Bus. & Com. Code Ann. § 1.103; *see Holloway-Houston, Inc. v. Gulf Coast Bank & Tr. Co.*, 224 S.W.3d 353, 362–63 (Tex. App.—Houston [1st Dist.] 2006, no pet.). "Although the Official UCC Comments following the code provisions are not law, they are persuasive authority concerning interpretation of the statutory language." *Fetter*, 110 S.W.3d at 687 (citations omitted). The commentary to section 1.103 states that the UCC "preempts principles of common law and equity that are inconsistent with either its principles or its purposes and policies." Tex. Bus. & Com. Code Ann. § 1.103 cmt. 2.

Section 9.406(a) of the UCC provides:

. . . [A]n account debtor on an account, chattel paper, or a payment intangible may discharge its obligation by paying the assignor, until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.

Tex. Bus. & Com. Code Ann. § 9.406(a). Section 9.406 provides that once Interflow notified Hilton about the assignment, Hilton can discharge its debt only by paying Interflow directly. *See id.*; *Tempay, Inc. v. Tanintco, Inc.*, No. 05-15-00130-CV, 2016 WL 192596, at *4–5 (Tex. App.—Dallas Jan. 15, 2016, no pet.) (mem. op.). Section 9.406 does not specifically address revocation or specifically designate an

ending date for the assignment. *See* Tex. Bus. & Com. Code Ann. § 9.406(a); *Tempay, Inc.*, 2016 WL 192596, at *8. "'[A]fter a debtor receives notice of a valid assignment, payment made by the debtor to the assignor or to any person other than the assignee is made at the debtor's peril and does not discharge the debtor from liability to the assignee.'" *Tempay, Inc.*, 2016 WL 192596, at *8 (quoting *Holloway-Houston, Inc.*, 224 S.W.3d 357–63) (concluding account debtor was required to pay the same debt twice after relying on assignor's request to no longer make payments in accordance with the notice from the assignee but instead make payments directly to assignor) (other citations omitted).

The commentary to section 9.102, titled Definitions and Index of Definitions, states that Article Nine refers to the "assignment" or the "transfer" of property interest, which are undefined terms. Tex. Bus. & Com. Code Ann. § 9.102 cmt. 26. Comment 26 explains that this "Article generally follows common usage by using the terms 'assignment' and 'assign' to refer to transfers of rights to payment, claims, and liens and other security interests." *Id.* Additionally, the summary judgment includes commentary from the Permanent Editorial Board for the UCC ("UCC Board") regarding the use of the term "assignment." Permanent Editorial Bd. for the Unif. Commercial Code: Commentary No. 21 Use of The Term "Assignment" in Article 9 of the Uniform Commercial Code (2020),

https://www.ali.org/media/filer_public/a1/67/a167ba0e-8983-4ec4-9ad0-8c77899c

3c06/commentary-21-final.pdf (last visited June 27, 2023). The UCC Board

explained that Article 9 applies to both an outright assignment of ownership of

specified payment rights and to the assignment of specified payment rights for

security ("SISO"), such as a security interest. *See id.* at 3–4.

The Factoring Agreement shows that Interflow agreed to purchase certain

accounts of Gulf Coast during the period of June 21, 2013, to June 20, 2014, and

Interflow's purchase of the "Purchased Accounts" shall constitute an irrevocable

assignment to Interflow of ownership and payment thereof. Again, it should be noted

that this "Term" of the agreement was to be continued and renewed for successive

one-year periods unless notice of termination was given by either party. However,

there is nothing in this record evidencing that the agreement was terminated. On

February 14, 2017, Interflow notified Hilton that on June 21, 2013, Gulf Coast

assigned and transferred to Interflow its right to collect payments on present and

future accounts receivables existing between Hilton and Gulf Coast. Interflow

requested that Hilton direct present and future payments to its address and informed

Hilton that the Notice of Assignment would remain in effect until Interflow provided

written notification withdrawing the notice. However, there is nothing in the record

evidencing that Interflow ever provided written notification withdrawing said notice.

21

The record includes Hilton's account analysis which shows that after it received Interflow's notice it made five direct payments to Interflow, but from May 2017 through May 2018, Hilton made payments directly to Gulf Coast totaling $155,152.58.

In November 2019, Interflow sent Hilton a letter stating that it provided the Notice of Assignment on February 14, 2017, June 16, 2017, and June 17, 2017, and Interflow demanded payment of the $155,152.58 Hilton paid Gulf Coast. Interflow explained that after Hilton received the Notice of Assignment, it was required to pay Interflow and that any payments Hilton made directly to Gulf Coast could not be used to discharge its liability on the assigned invoices. Interflow stated that it was unaware if Gulf Coast represented that the Notice of Assignment was no longer effective, but if it had made such a representation, Hilton was not allowed to rely on Gulf Coast's word. The record does not show that Interflow provided Hilton written notification withdrawing the notice. Rather, the record shows that in the June 2017 email, Interflow's Kevin Roy advised Hilton's Jon Stup to adhere to the Notice of Assignment sent by Interflow after Stup reported that Gulf Coast requested Stup to make direct payments to Gulf Coast. In his affidavit, Roy averred that Hilton stopped making payments after it received notice of the assignment, and Interflow's counsel, Bill Richey, averred that Hilton did not respond to his demand for payment. The

22

record also includes Hilton's Responses to Plaintiff's Discovery Requests, in which it admitted that after receiving the Notice of Assignment, it made direct payments to Gulf Coast totaling $155,152.58. Hilton also admitted that it received Interflow's demand letter and made no payments to Interflow. Hilton included the affidavit of Hilton Koch, its general manager, who averred that Hilton paid all invoices ever owed to Gulf Coast.

We conclude that Hilton was not entitled to judgment as a matter of law on its claim that section 9.406(a) did not apply to Interflow's claimed lien on unassigned accounts because comment 26 of section 9.102 explained that the term "assignment" included the transfer of rights to liens and other security interests. *See* Tex. Bus. & Com. Code Ann. § 9.102 cmt. 26; *see also* Tex. R. Civ. P. 166a(c); *Fielding*, 289 S.W.3d at 848. We also conclude that Hilton was not entitled to judgment as a matter of law on its claim that the Notice of Assignment did not obligate Hilton to pay Interflow to discharge the alleged unassigned invoices. *See* Tex. R. Civ. P. 166a(c); *Fielding*, 289 S.W.3d at 848. The summary judgment evidence shows that Interflow notified Hilton that (1) its account had been assigned and it had the right to collect payments on present and future account receivables; (2) it should direct current and future payments to Interflow; and (3) the notice will remain in effect until Interflow provided written notification withdrawing the notice. The evidence further shows

23

that after receiving the Notice of Assignment and being advised in writing to adhere to the Notice of Assignment, Hilton tendered payments to Gulf Coast at its own peril and failed to discharge its debt to Interflow pursuant to section 9.406. *See Holloway-Houston, Inc.*, 224 S.W.3d at 361; *BOC Grp., Inc, v. Katy Nat. Bank*, 720 S.W.2d 229, 231 (Tex. App.—Houston [14th Dist.] 1986, no writ.).

Hilton also moved for summary judgment on its claim that Interflow's Rule 11 agreement with Gulf Coast allowed Hilton to pay Gulf Coast directly for the invoices about which it now complains. Hilton argued that Interflow should be quasi-estopped from pursuing its claims because the Rule 11 Agreement allowed Hilton to make payments to Gulf Coast.

The Factoring Agreement includes the following provision:

> 1.4    In order to avoid objections and loss of trade from its customers through the collection of Purchased Accounts by [Interflow] directly from the Account-Debtors, Seller may make collections of the Purchased Accounts as trustees for [Interflow] as long as no Event of Default has occurred . . . . [Interflow] may terminate Seller's right and privilege of collection at any time without notice, and this right shall immediately terminate without notice in any case upon Seller's suspension of business, or the occurrence of any Event of Default described in Section 6.1(1). Seller agrees that all funds so collected shall be held by Seller in trust for [Interflow] and may not be commingled with funds of Seller. Seller agrees that it will transfer or deliver to [Interflow] . . . on the day of receipt and in the form received . . . all original checks, drafts, notes, and other evidences of payment received in full payment or on account of any Purchased accounts together with all original statements or vouchers pertaining to them.

The August 2017 Rule 11 Agreement applied to the purchased accounts and states as follows:

> 1. Both of our clients will report to their counsel any money <u>received to date</u> on each account, which will be shared with opposing counsel. Supporting documents will be provided.
>
> 2. Gulf Coast AND Interflow will not take active steps to collect the accounts.
>
> 3. Both of our clients will report to their counsel any money received <u>from this date forward</u> on each account, which will be shared with opposing counsel. One hundred percent (100%) of that money will be held in trust by the counsel for the party that received it, until further order by the Court or further agreement by the parties as to the disposition of the funds
>
> This is a temporary agreement. The purpose of this agreement is to preserve the status quo while providing revenue for Gulf Coast. Ultimately, if we don't reach another agreement, then we will be scheduling a temporary injunction hearing on an agreed date. Unless otherwise agreed in writing, this agreement will be superseded by any order entered by the court.
>
> Also, any actions taken in accordance with this agreement can't be used as evidence of wrongdoing by either party.

The parties' Rule 11 discussions also showed that Interflow's attorney proposed the following concerning the purchased accounts:

> . . . "Gulf Coast would report to my firm any money received on any account from this point forward. The funds will be accounted for as to which client/invoice they derived from. Gulf Coast would retain

25

75 percent of the funds for normal and ordinary operating expenses. The remaining 25 percent would be placed in my firm's trust account or an escrow account maintained by my law firm. That 25 percent would remain in the trust or escrow account until further order by the Court or further agreement by the parties as to the disposition of the funds.

Hilton also included Bill Richey's November 2017 email to Gulf Coast's counsel enclosing a Rule 11 Agreement reached by Interflow and Gulf Coast in August 2017, showing the parties agreed they both would not take active steps to collect the accounts. Richey's email explained that Gulf Coast had lost accounts, clients, and officers due to Interflow's collection activities and that any agreement regarding the future collection of purchased accounts would be handled by Gulf Coast so it could repair any damage to their remaining clients. We note that none of the communications concerning the Rule 11 Agreement were sent to Hilton, and there is no evidence in the record showing that Interflow provided written notification to Hilton that the Notice of Assignment was no longer effective or that it had authorized Gulf Coast to accept payments on its behalf. Instead, the record shows that Interflow advised Hilton to adhere to the Notice of Assignment. Furthermore, there is nothing in the record evidencing that Hilton had any privity of contract with the Rule 11 Agreement between Gulf Coast and Interflow, nor that Hilton was a third-party beneficiary of said Rule 11 Agreement. *See First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017) (explaining party claiming third-party

26

beneficiary status must show that the contracting parties intended to secure a benefit to that third party and entered into that contract directly for the third party's benefit); *Gore v. Smith*, No. 05-19-00156-CV, 2020 WL 4435312, at *3 (Tex. App.—Dallas Aug. 3, 2020, pet. denied) (mem. op., not designated for publication) (stating that privity exists if the defendant contracted with the claimant or someone who assigned its cause of action to the claimant and explaining law firm was third-party beneficiary of the Rule 11 Agreement because the agreement clearly and unequivocally expressed the parties' intent to directly benefit the law firm).

While the UCC's provisions do not control when the parties have contracted and negotiated a specific agreement, there is no evidence that Interflow or Gulf Coast notified Hilton of the Rule 11 Agreement or that Interflow authorized Hilton to pay Gulf Coast directly. *See Cadence Bank, N.A. v. Elizondo*, 642 S.W.3d 530, 534 & n.4 (Tex. 2022); *Lenape Res. Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 570 (Tex. 1996) (discussing Article 2 of the UCC and parties being able to vary those provisions by agreement). Instead, the evidence shows that in June 2017, two months before Interflow and Gulf Coast entered into the Rule 11 Agreement, Hilton informed Interflow that Gulf Coast requested that it pay Gulf Coast directly, and Interflow advised Hilton to adhere to the Notice of Assignment despite Gulf Coast's request. The evidence also shows that Hilton began paying Gulf Coast directly in

27

May 2017, before the parties reached any agreement, and Hilton made direct payments totaling $155,152.28 to Gulf Coast until June 2018.

We have already explained that the UCC preempts principles of common law and equity, including estoppel, that are inconsistent with its purposes and principles, and Hilton's argument is an attempt to persuade this Court that it can discharge its debt by paying the assignor instead of the assignee and avoid the clear directives mandated by section 9.406 to pay the assignee. *See* Tex. Bus. & Com. Code Ann. §§ 1.103 & cmt. 2, 9.406; *Holloway-Houston, Inc.*, 224 S.W.3d at 363 & n.4. We hold that Hilton cannot rely on estoppel to supplant the clear directives mandated by section 9.406. We conclude that Hilton was not entitled to judgment as a matter of law on its claim that Interflow should be quasi-estopped from pursuing its claims because the Rule 11 Agreement allowed Hilton to make payments to Gulf Coast. *See* Tex. R. Civ. P. 166a(c); *Fielding*, 289 S.W.3d at 848. Having concluded that Hilton was not entitled to judgment as a matter of law on any of its summary judgment claims, we further conclude the trial court erred in granting summary judgment in favor of Hilton. We sustain Interflow's first issue.

**Interflow's Motion for Summary Judgment**

Interflow moved for summary judgment on its claim that Hilton was aware of the Notice of Assignment and obligated to make payments to Interflow under section

9.406(a) and that Hilton was estopped from asserting any defenses based on the improper payments it made to Gulf Coast. Interflow argued that the matter should be resolved by summary judgment because the balance owed was undisputed. We have already explained that Hilton was required to make payments to Interflow under section 9.406(a) and that Hilton was estopped from asserting its estoppel defense. The summary judgment evidence shows that after receiving Interflow's Notice of Assignment, Hilton at some point made direct payments to Gulf Coast totaling $155,152.58, Interflow demanded payment, and Hilton made no payments to Interflow. We hold that Interflow was entitled to judgment as a matter of law on its claim that Hilton was required to make payments to Interflow under section 9.406(a) and that Hilton failed to directly pay Interflow payments totaling $155,152.58. *See* Tex. R. Civ. P. 166a(c); *Fielding*, 289 S.W.3d at 848; *see also* Tex. Bus. & Com. Code Ann. § 9.406(a). We conclude the trial court erred in denying summary judgment in favor of Interflow. We sustain Interflow's second issue.

**CONCLUSION**

Having sustained both of Interflow's issues, we reverse the trial court's summary judgment granting Hilton's Motion for Summary Judgment, reverse the trial court's summary judgment denying Interflow's Motion for Summary Judgment, render judgment in favor of Interflow for $155,152.58, and remand the case to the

29

trial court to determine whether Interflow is entitled to any reasonable and necessary attorney's fees, costs, prejudgment interest, and post-judgment interest.

REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.

W. SCOTT GOLEMON
Chief Justice

Submitted on July 5, 2023
Opinion Delivered October 12, 2023

Before Golemon, C.J., Horton and Wright, JJ.